992 A.2d 519

**Polly KEYES, et al.**

v.

**Sheldon H. LERMAN, et al.**

**No. 2290 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

March 30, 2010.

534

Laurence A. Marder (Emily C. Malarkey, Salsbury, Clements, Bekman, Marder & Adkins, LLC, on the brief), Baltimore, MD, for Appellant.

Charles I. Joseph (Amanda P. Just, Shaw, Morrow & Joseph, PA, on the brief), Hunt Valley, MD, for Appellee.

Panel: DAVIS, KEHOE and ALAN M. WILNER (Retired, Specially Assigned), JJ.

ALAN M. WILNER, Judge (Retired, Specially Assigned).

This is a medical malpractice action filed by appellants, Polly and Stuart Keyes, against appellee, Sheldon Lerman, in the Circuit Court for Baltimore County. After a full trial, the jury concluded that Dr. Lerman was not negligent and returned a verdict in his favor. In this appeal, appellants complain that the unfavorable verdict resulted from the refusal of the court (1) to give a requested spoliation of evidence instruction, and (2) to permit cross-examination of a defense expert witness that would have revealed to the jury that both the witness and Dr. Lerman had medical malpractice insurance policies issued by Medical Mutual Liability Society of Maryland. Perceiving no error, we shall affirm.

## BACKGROUND

Ms. Keyes appeared at the St. Joseph's Medical Center emergency room on June 12, 2006, complaining of abdominal pain. After an initial examination and certain tests conducted by the emergency room staff, Dr. Lerman, who had removed a cancer from Ms. Keyes's colon nine years earlier, was consulted. After examining Ms. Keyes and reviewing the test results, Dr. Lerman arrived at a diagnosis of gall bladder disease and possible small bowel obstruction. Additional tests seemed to confirm a non-functioning diseased gall bladder but revealed no evidence of a small bowel obstruction. The next day, he removed the gall bladder through a laparoscopic cholecystectomy.

During the operation, Dr. Lerman observed some dilation of the small bowel but no apparent obstruction. He observed as well some adhesions but decided not to remove them, as that would have entailed much more extensive surgery. Instead, he opted to monitor Ms. Keyes's post-operative progress. Unfortunately, Ms. Keyes did not progress well. An examination the next day revealed a distended abdomen, and a CAT scan conducted that evening indicated to the radiologist a small bowel obstruction. On June 15, after confirming that diagnosis, Dr. Lerman performed the more extensive sur-

gery—a laparotomy—and removed 62 cm. of dead small bowel and 40 cm. of large bowel. Ms. Keyes was discharged on June 20 but was readmittted from June 22 to June 26 and again on July 4. On July 5, she underwent a third operation to repair an anastomatic leak and to remove an additional 34 cm. of bowel.

The issue of spoliation raised by appellants concerns the June 15 surgery that dealt with the small bowel obstruction— something they believe should have been dealt with on June 13. Among the hospital's Medical Staff Rules and Regulations is a requirement that an "operative report" be recorded on all patients who had surgery performed at the hospital. Among other things, the report is to contain "indications for operation" and "description of the findings," and it is to be "dictated immediately after surgery, transcribed by the Medical Record department and placed on the patient's chart on the floor within one working day of the operation." The responsible surgeon is required to sign the typed report "as soon as possible."

Dr. Lerman testified that, to the best of his knowledge, he dictated an operative report following the June 15 surgery, but there was substantial evidence to the contrary. No such report was found in Ms. Keyes's medical record, and there was no indication in the hospital's computer archival documents that one was ever dictated. Appellants argued that this was not an innocent omission, in that Dr. Lerman had occasion to review Ms. Keyes's chart on at least two occasions in the succeeding month and would have noticed that the operative report was missing. They claimed that the absence of the report hindered the ability of their experts to render opinions regarding Dr. Lerman's compliance with the applicable standard of care, and, prior to closing argument, they requested an instruction, in the form of Maryland Pattern Jury Instruction (Civil) 1:10, on spoliation. The court permitted counsel to argue spoliation to the jury, but it declined to give the requested instruction.

The second issue concerned a defense expert witness, Dr. Kafonek. Prior to Dr. Kafonek's testimony, appellants advised the court that they wished to cross-examine him on two matters going to alleged bias on his part. First, they wished to bring out the fact that, in a prior unrelated proceeding, he had been represented by the law firm representing Dr. Lerman, and second, they wanted to establish that Dr. Kafonek had a relationship with that firm, in which he reviewed malpractice cases for them and had testified as an expert in cases they handled at least ten times in the past. In presenting argument on that second point, appellants noted that Dr. Kafonek had stated in a discovery deposition that he would not testify against another Baltimore County doctor insured by Medical Mutual Liability Insurance Society of Maryland, with which he also had a policy of medical malpractice insurance. Dr. Lerman moved, *in limine*, to preclude any questions that would reveal the existence of medical malpractice insurance, and, although the court said that it would allow questions regarding Dr. Kafonek's relationship with defense counsel and his refusal to testify against Dr. Lerman, it granted the motion to the extent of precluding any mention of medical malpractice insurance.

## DISCUSSION

### Spoliation Instruction

In general parlance, spoliation is "the act of plundering; robbery; plunder; particularly, the act of plundering an enemy in time of war." *Webster's New Universal Unabridged Dictionary*, 2nd ed. (1979) at 1755. In law, the word has a more particularized meaning, though one that is entirely consonant with the general concept. Black defines it as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usu[ally] a document." *Black's Law Dictionary*, 8th ed. (2004) at 1437.

Courts and commentators have viewed the spoliation of evidence as perhaps the most grievous aspect of the broader situation in which a party fails to produce evidence that is, or

was, available to the party and that the party might ordinarily be expected to produce. This may be in the form of witnesses, documents, or other tangible evidence, the precise issue, in any of these situations, being what, if any, inference may be drawn by the trier of fact from the non-production of such evidence. The most recent edition of *McCormick on Evidence* well expresses the long-held general rule that:

> "When it would be natural under the circumstances for a party to call a particular witness, or to take the stand as a witness in a civil case, or to produce documents or other objects in his or her possession as evidence and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference."

2 *McCormick on Evidence,* 6th ed. (2006), § 264 at 220.

Because the circumstances surrounding the non-production of evidence vary, this general rule is subject to a host of caveats and distinctions designed to ensure that, in the particular case, the inference is a fair and reasonable one. As Wigmore points out, "[t]hese inferences, to be sure, cannot fairly be made except upon certain conditions; and they are also open always to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure." 2 *Wigmore, Evidence* § 285 at 192 (Chadbourne rev. 1979).

With respect to uncalled witnesses, the courts have tended to limit the inference to situations in which (1) the witness was peculiarly available to one party and could have been produced by that party, and (2) the testimony that might be expected from the witness would be important and not merely cumulative and would elucidate the transaction. *See Mitchell v. State,* 408 Md. 368, 384, 969 A.2d 989, 999 (2009); *Bereano v. State Ethics Comm'n,* 403 Md. 716, 741, 944 A.2d 538, 552 (2008); *Woodland v. State,* 62 Md.App. 503, 509–10, 490 A.2d 286, 289–90 (1985). Similarly, for the inference to apply to documents and other tangible evidence not produced, it must be shown that the party was able to produce the evidence and

that the evidence would have been admissible. *Wigmore, supra,* § 291, at 225–27.

Although the word "spoliation" or conduct involving the intimidation of witnesses or the actual destruction of or tampering with evidence is sometimes included in a more general discussion of missing witnesses or evidence, that kind of conduct is regarded as more egregious and, to an extent, different in kind, than simply not producing available evidence. It has been characterized as conduct constituting obstruction of justice and analogized to other conduct of that nature. The inference that may be drawn from *that* kind of conduct goes beyond allowing a finding that the missing evidence, if produced, would be unfavorable, but allows, in addition, an inference of consciousness of guilt in a criminal case or a belief that the party's case is weak. McCormick observes:

> "[A] party's failure to produce evidence that he or she is free to produce or withhold may be treated as an admission. As might be expected, wrongdoing by the party in connection with its case amounting to an obstruction of justice is also commonly regarded as an admission by conduct. By resorting to wrongful devices, the party is said to provide a basis for believing that he or she thinks the case is weak and not to be won by fair means, or in criminal cases that the accused is conscious of guilt. Accordingly, the following are considered under this general category of admissions by conduct: a party's false statement about the matter in litigation ...; subornation of perjury; fabrication of documents; undue pressure by bribery; intimidation, or other means to influence a witness to testify favorably or to avoid testifying; *destruction or concealment of relevant documents or objects;* attempt to corrupt the jury; and hiding or transferring property in anticipation of judgment."

*McCormick, supra,* § 265 at 226–27 (Emphasis added).

The Maryland Pattern Jury Instructions for criminal cases articulate that distinction quite well. *Compare* MPJI–Cr 3:29 (Missing Witness) with MPJI–Cr 3:26 (Concealment or Destruction of Evidence as Consciousness of Guilt), MPJI–Cr

3:27 (Suppression, Alteration or Creation of Evidence as Consciousness of Guilt), and MPJI–Cr 3:28 (Bribery or Witness Intimidation as Consciousness of Guilt). The Pattern Jury Instructions for civil cases, presumably because "consciousness of guilt" is not relevant in civil cases, do not draw that distinction, or, indeed, any distinction between mere missing evidence and the more culpable conduct. There is no form pattern jury instruction dealing generally with missing evidence or uncalled witnesses—only MPJI–Cv 1:10 dealing with spoliation, which is the instruction requested by appellants. It reads:

> "The *destruction of or the failure to preserve* evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the *destruction or failure to preserve* must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the *destruction or failure to preserve* the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party."

(Emphasis added).

This instruction reorganizes somewhat the matrix of concepts. It deals with the destruction or failure to preserve evidence, rendering it unavailable, and not merely the failure to produce evidence that *is* available, or, indeed, the failure to create evidence, but, for purposes of the permissible inference, it does distinguish between destruction or failure to preserve with an intent to conceal the evidence and destruction or failure to preserve that is the product of negligence.

The court gave several reasons for rejecting the requested instruction. Primarily, it noted that there was no evidence that Dr. Lerman actually destroyed or failed to preserve the operative report. At worst, the report was simply never written—the evidence never existed. The court cited testimony by the hospital's Director of Health Information Management and Privacy Office that it was not uncommon for

physicians to forget to dictate operative reports, discharge summaries, and other medical records, that the Medical Records Department routinely reviewed medical charts and would remind a physician if an operative report or other medical record was missing, but that Ms. Keyes's chart was not flagged and thus Dr. Lerman was never notified that his operative report was missing.

From this, the court speculated that Dr. Lerman may have dictated the operative report, which was later lost or misplaced by hospital personnel, or, even if he did not dictate the report, it was the kind of omission that apparently was not uncommon and did not indicate that the report would have been unfavorable to him. There clearly was no finding by the court, or evidence that would support a finding by the jury, that Dr. Lerman deliberately failed to dictate the report in contravention of hospital policy in order to conceal evidence of wrongdoing on his part. The "bottom line" was that the court did not believe, from the evidence in the case, that the requested instruction was appropriate.

Relying on a number of Maryland cases and one case from Rhode Island, appellants aver that the Circuit Court erred in distinguishing between the destruction or non-preservation of evidence, on the one hand, and the non-creation of evidence, on the other, where there is a duty to create such evidence. It is their view that, where a party was under a duty to make a report documenting certain events that could have legal significance, the failure to make such a report, under certain circumstances, may create an inference that the report, if made, would have been unfavorable to a position taken by the party in the litigation, and there is, indeed, some authority to support that view. Even if appellants are correct, however, the question here is not whether, in the circumstances of this case, such an inference was permissible from Dr. Lerman's alleged failure to dictate an operative report, but only whether the court was obliged to so instruct the jury.

The Court of Appeals addressed that issue, in the context of a criminal case, in *Patterson v. State*, 356 Md. 677, 741 A.2d

1119 (1999). The defendant there was charged with possession of cocaine which, after a traffic stop, was found in a jacket discovered in the trunk of his car. Rather than produce the jacket, however, the State put into evidence a photograph of the jacket, as it lay in the trunk. Patterson requested a missing evidence instruction that, if the evidence would have provided important information, if it was peculiarly within the power of the State to produce, if it was not produced, and if its absence was not sufficiently explained, the jury could decide that the evidence would have been unfavorable to the State. The trial court declined to give the requested instruction, and that was the issue on appeal.

The Court treated the issue as hinging on the proper interpretation of the first sentence of Md. Rule 4–325(c), which states that, in a criminal case, the trial court may, "and at the request of any party shall, instruct the jury *as to the applicable law* and the extent to which the instructions are binding." (Emphasis added). Keying on the italicized part of the Rule, the Court observed that the requirement is that "instructions be given in respect to the applicable law in a case" and "does not apply to factual matters or inferences of fact." *Id.* at 684, 741 A.2d at 1122. The Court continued:

> "Instructions as to facts and inferences of facts are normally not required. When a party fails to produce evidence, an inference may be made against it. Many inferences, however, may be drawn from a missing piece of evidence and 'emphasis of one possible inference out of all the rest by a trial judge can be devastatingly influential upon a jury although unintentionally so.' "

*Id.* (quoting *Yuen v. State,* 43 Md.App. 109, 114, 403 A.2d 819, 823 (1979)). After reviewing earlier cases in the Court of Appeals, this Court, and from other States, the Court, in an effort to "further refine the issue," held flatly that "regardless of the evidence, a missing evidence instruction generally need not be given; the failure to give such an instruction is neither error nor an abuse of discretion." *Id.* at 688, 741 A.2d 1119, 741 A.2d at 1124–25. *See also Lowry v. State,* 363 Md. 357,

373–74, 768 A.2d 688, 697 (2001); *Bereano v. State Ethics Comm'n, supra,* 403 Md. at 753–54, 944 A.2d at 559–60 (2008).

Lerman regards *Patterson* as "controlling" and therefore as "establish[ing] that the circuit court was not required to give MPJI 1:10." In the end, we shall agree with him, but the connection is not quite so direct. *Patterson* was a criminal case, and, as noted, the Court's analysis hinged on the statement in Md. Rule 4–325(c) requiring, in a criminal case, that a trial court, at the request of a party, "instruct the jury as to the applicable law and the extent to which its instructions are binding." The Court's conclusion that a spoliation or missing evidence instruction was not required was based entirely on its view that the unfavorable inference arising from the failure of a party to produce admissible evidence was not a statement of "applicable law." Rule 4–325 does not apply to civil cases, however.

The analogous Rule on jury instructions in civil cases is Rule 2–520 which, in most respects, mirrors Rule 4–325. The one critical respect in which it does not mirror the criminal Rule is the omission of the very language in Rule 4–325(c) that the Court found compelling in *Patterson.* The first sentence of Rule 4–325(c) is absent from Rule 2–520(c). The question is the relevance of that omission: does it indicate an intent that the two Rules be construed differently in this regard, or does the broader underpinning of *Patterson,* that instructions need be given only on issues of law, apply as well in civil cases?

As a preface, we observe that the criminal and civil Rules on required jury instructions have been worded differently since the initial adoption of the Maryland Rules; this is not anything new. The earliest predecessor of Rule 2–520 that we could locate was Rule 6 of the General Rules of Practice and Procedure, as revised and adopted by the Court of Appeals in November, 1945. In relevant part, it permitted the parties to file written prayers that the court instruct the jury "on the law as set forth in the prayers" and provided that the court "may instruct the jury upon the law of the case, either by granting requested instructions or by giving instructions of its

own on particular issues or on the case as a whole ... but need not grant any requested instruction if the matter is fairly covered by instructions actually given."

A criminal case counterpart—Rule 6 of the Criminal Rules of Practice and Procedure—was not proposed until 1949. *See* Fifth Report of the Standing Committee on Rules of Practice and Procedure (Rules Committee), October 3, 1949. The drafting of that Rule was the product of much debate within the Rules Committee, primarily because of Art. 23 of the Md. Decl. Of Rts., declaring that, "[i]n the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact." As that provision was construed at the time, all instructions on the law in criminal cases were advisory only, which was not so in civil actions. As adopted by the Court, section (a) of the criminal Rule was identical to the then-existing civil counterpart, permitting the parties to submit written prayers that the court instruct the jury "on the law as set forth in the prayers." In contrast to the civil Rule, however, § (c) of the criminal Rule stated that "[t]he Court may and at the request of any party shall grant such advisory instructions to the jury as may correctly state the applicable law" but added a requirement that, in every case in which instructions were given, the court had to tell the jury that they, themselves, were the final judges of the law and that the court's instructions were advisory only. Despite the difference in wording, both Rules limited instructions to matters of law.

Although the scope and import of Md. Decl. Of Rts. Art. 23 have been significantly circumscribed since 1949 (*see Stevenson v. State*, 289 Md. 167, 423 A.2d 558 (1980)), the Constitutional provision has continued to influence the wording of the criminal Rule; hence, the requirement in Rule 4–325(c), at the end of the sentence at issue in *Patterson*, that the court instruct the jury on "the extent to which the instructions are binding."

The relevant text of the civil Rule, which penultimately ended up as Rule 554, remained much the same as its predecessor, Rule 6. Section a. permitted the parties to file written

prayers that the court instruct the jury "on the law as set forth in the prayers," and section c. permitted the court to instruct "on the law" by granting the requested instructions, giving its own instructions, or a combination of those methods. The Rule still expressly limited instructions to "the law."

The articulation of that limitation was removed when Rule 2–520 was adopted as part of the general rewriting of the Maryland Rules in 1984, but there is no indication in the legislative history of the development of Rule 2–520 that any change in substance was intended. Indeed, the minutes of the Rules Committee meetings reveal quite the opposite. The initial draft of Rule 2–520 (then tentatively designated as Rule 2–523), as presented at the Rules Committee's April 21, 1981 meeting, referred to the instructions being "as to the applicable law." *See* Rules Committee Minutes, April 21, 1981 at 38. There was debate over *when* instructions should be given—the preference being that they be given prior to closing argument rather than "at any time after the close of the evidence," as then proposed—but no issue was raised about the instructions being "on the law." Nonetheless, when the Rule was redrafted to take account of that preference, the "on the law" language was deleted, without any explanation. *See* Rules Committee Minutes, May 23, 1981 at 18. The explanatory note attached to the redraft stated that the Rule had been redrafted in accordance with decisions made at the April 21 meeting, that section (c) was derived from then-current Rule 554, and that "[n]o substantive change is intended." *Id.* at 19.

We glean two important and inter-related things from this history. First, the difference in language between Rule 2–520(c) and Rule 4–325(c)—the omission of the first sentence in Rule 4–325(c) from Rule 2–520(c)—is explained by the impact of Md. Decl. Of Rts. Art. 23 on instructions given in criminal cases and has no independent significance in terms of the issue before us. Second, the deletion of the words "on the law" in the development of Rule 2–520 was, at worst, inadvertent—a byproduct of an attempt to deal with a different issue—and was not intended to permit instructions on the evidence or on the facts in civil cases.

We thus construe Rule 2–520 as limiting instructions to matters of law—to the law applicable in the case—and therefore entirely consonant with Rule 4–325. In light of that construction, *Patterson* is controlling. Whether, in given circumstances, an unfavorable inference may be drawn from missing evidence or witnesses is a matter of *fact,* not law, and the court is under no obligation to give an instruction on the matter. It may do so, and in certain circumstances perhaps it *should* do so, but, as clearly stated in *Patterson,* failure to do so is not error or an abuse of discretion. Counsel was permitted to comment on the missing operative report in his closing argument, and he did so.

### Cross–Examination of Dr. Kafonek

As we noted above, in an effort to show that Dr. Kafonek was biased, appellants' counsel wanted to bring out on cross-examination (1) that, on one occasion about ten years earlier, Dr. Kafonek had been represented by Dr. Lerman's attorneys in an unrelated case, (2) that since then he had reviewed medical malpractice cases for that firm and had testified a number of times in cases they defended, and (3) at his discovery deposition, he asserted that he would not testify against another Baltimore County doctor insured by Medical Mutual Liability Insurance Society.

The court precluded the first inquiry on the ground that the jury likely would conclude (as was the case) that the representation had involved a malpractice action against Dr. Kafonek and that the prejudicial impact of that would outweigh any probative value it might have. The court said that it would allow cross-examination regarding the services Dr. Kafonek performed for defense counsel, and he was, in fact, cross-examined with respect to those services. With respect to the third area, counsel urged that, because Dr. Kafonek was insured by the same insurer as Dr. Lerman, it was appropriate for the jury to consider favoritism on his part toward that insurer. The court responded that it would allow counsel to elicit whether Dr. Kafonek would never, under any circumstance, testify against Dr. Lerman, but it would not allow him

to elicit the fact that Dr. Lerman was insured by Medical Mutual, or any other malpractice insurer.

Appellants complain about the two unfavorable rulings—the one lawsuit in which Dr. Kafonek was defended by Dr. Lerman's defense counsel and his unwillingness to testify against doctors insured by Medical Mutual. They rely on *Wrobleski v. de Lara,* 353 Md. 509, 525, 727 A.2d 930, 938 (1999) for the proposition that, especially with respect to expert witnesses, "wide discretion must be allowed in permitting cross-examination as to bias and interest" and note that the Rule dealing with liability insurance, Md. Rule 5–411, renders such evidence inadmissible only as to whether the insured acted wrongfully and does not require exclusion when offered to show bias or prejudice of a witness.

Overarching those principles, and unmistakably confirmed in *Wrobleski,* however, is that "the scope of cross-examination of expert witnesses is largely within the control and discretion of the trial judge." *Id.* Not every question or line of inquiry that may go to bias must be allowed. The court always has discretion to balance probative value against unfair prejudice. *See* Md. Rule 5–403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...").

Here, the court clearly tried to balance counsel's desire to show a bias on Dr. Kafonek's part due to his association with defense counsel against the prejudice to Dr. Lerman from revealing that he had liability insurance. The motion *in limine* was granted only "as far as any mention of medical malpractice insurance." Counsel was able to show the nature and extent of Dr. Kafonek's economic association with defense counsel generally and Dr. Lerman's attorneys in particular, and he was offered the opportunity of exposing Dr. Kafonek's reluctance to testify against doctors in Baltimore County, so long as that would not reveal that Dr. Lerman was insured.[1]

---

1. Dr. Kafonek testified about three levels of involvement in medical malpractice cases: files referred by lawyers for evaluation, deposition

On this record, we find no abuse of discretion in the court's rulings.

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**

testimony, and trial testimony. He said that he had evaluated about 100 cases, the vast majority of which were for physicians and 10 to 15 of which had been referred by Dr. Lerman's attorneys. He said he had given deposition testimony 30 to 40 times and had testified in court 11 times, of which four or five were for Dr. Lerman's attorneys. In all but one of the cases in which he testified, he testified for the defendant physician. He said that the cases in which he worked for plaintiffs came from outside the Baltimore area. Dr. Kafonek disclosed that he was being paid $400 per hour for his time spent testifying.