42 A.3d 646

Clayton COLKLEY

v.

STATE of Maryland.

Darnell Fields

v.

State of Maryland.

Nos. 1770, Sept. Term, 2010, 1764, Sept. Term, 2010.

Court of Special Appeals of Maryland.

April 26, 2012.

594

Brian L. Zavin & Brian L. DeLeonardo (Paul B. DeWolfe, Public Defender, Baltimore, MD and DeLeonardo, Smith & Associates, LLC, Reisterstown, MD, on the brief), for appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., MATRICCIANI, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), J.

In a retrial, the appellants, Clayton "Coco" Colkley and Darnell "Pooh" Fields, were convicted in the Circuit Court for Baltimore City by a jury, presided over by Judge George L. Russell, III. Colkley was found guilty of second-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, the illegal use of a handgun, and two counts of unlawfully wearing or carrying a handgun. Fields

was convicted of conspiracy to commit first-degree murder, second-degree assault, and the unlawful wearing or carrying of a handgun. In this consolidated appeal, we must address a veritable decathlon of challenges.

### The Opening Round

The crimes in this case were committed almost a decade ago, on May 28, 2003. Following an initial jury trial, presided over by Judge John M. Glynn in March of 2005, both Colkley and Fields were convicted in a variety of crimes. Both appealed to this Court. On February 2, 2007, we filed an opinion in *Fields v. State*, 172 Md.App. 496, 916 A.2d 357, *cert. denied*, 399 Md. 33, 922 A.2d 574 (2007), in which we reversed the convictions because of an improper response to a note from one of the jurors. The case was remanded for further proceedings.

### The Final Round

The retrial before Judge Russell and a jury consumed eleven trial days. Colkley was convicted of the second-degree murder of James "Buck" Bowens, the attempted first-degree murder of William Courts, conspiracy to commit the first-degree murder of William Courts, and various handgun offenses. Fields was also convicted of conspiracy to commit the first-degree murder of William Courts, a second-degree assault on William Courts, and a handgun charge. Although Yvette Hollie, as unintended collateral damage, was shot in the arm and hospitalized, none of the convictions was based on the attack on her.

### The Back Story

The May 28, 2003 crimes constituted a single skirmish in an ongoing turf war between two rival drug-selling organizations in Baltimore City. In the larger picture, which inevitably intrudes itself into the narrative of May 28, 2003, there are so many murderers, accomplices of murderers, hirers of murderers, murder victims, and intended murder victims, all of whom have both legal names and wildly unrelated street names, that

it is impossible to follow the game without a well-annotated scorecard.

If we appreciate from the opening scene that the appellant Clayton Colkley was a contract killer, the whole story will be a lot easier to follow. The accessory-before-the-fact who hired Colkley as a hit man was Eric Horsey. Horsey was the head of a major drug-distributing operation in East Baltimore. The apparently smaller but rival drug organization was run by the brothers William and David Courts. Their operation distributed drugs from a geographic base centered on the intersection of Lafayette Avenue and Port Street, also in East Baltimore. It was the William and David Courts group that was the target of the May 28, 2003 shooting spree in the 1700 block of Port Street.

Bad blood between Horsey and the Courts brothers had been brewing for at least five months. In January of 2003, David Courts had shot two of Horsey's close associates in front of a Teamsters' Hall. Killed was a man known as "Tool," who was Horsey's best friend. Wounded was a man known as "Gigit," who was Horsey's brother. For the next month or so, Horsey went on a revenge-inspired shooting spree, by his own admission shooting "quite a few individuals" in the area of Port Street and Lafayette Avenues. Jermaine "Polish" Lee, a member of the Courts brothers' group, was shot, along with several other members of the group, while "standing around Lafayette and Port."

It was in March of 2003 that Colkley first peddled his services to Horsey as a hired gun who, for a price, offered to eliminate both William Courts and David Courts. The deal with Horsey was then on and off for several months. It was Colkley who led the execution-style raid of May 28, 2003. Horsey refused to pay him, however, when it came to light that one of the two desired targets, William Courts, had survived even after receiving ten bullets at point-blank range. When Colkley and Brian "Bee" Smith were successful in killing David Courts on the very next day, however, Horsey readily paid them $10,000 for the job. This background is the

context for a full understanding of what happened on May 28, 2003.

### May 28, 2003: Armageddon

Instead of the Earps versus the Clantons, May 28, 2003 was scripted to be the showdown between Horsey and the Courts brothers, although neither Eric Horsey nor David Courts literally showed up at the corral that day. A key witness to the events of that day was Jermaine Lee. Lee was a part of the Courts brothers' organization. He was sitting on the steps of a house in the middle of the 1700 block of Port Street with William Courts and James Bowen when a car pulled quickly around the corner and stopped in front of them. The sound of the car startled the three men, who were "on point" (on their guard) as a result of the series of shootings that had been going on since January. They let down their guard immediately, however, when Bowens recognized the driver of the car as the appellant Darnell "Pooh" Fields, saying, "Nah. That car's cool. That's Pooh's car." Lee testified that he also knew Fields from prior drug deals and had no reason to fear him. He described the car as a "cream colored" older model car, possibly a Grand Marquis, with tinted windows. After signaling to the others that there was no danger, Bowens approached the passenger side of the car "with his hand on his dip." At that moment, however, the passenger door swung open, the appellant Colkley dove out in "a falling motion," and Colkley shot Bowens in the chest from a distance of about the length of a car door. Despite being shot, Bowens ran in the direction of Lafayette Avenue. Lee ran as well. As he did so, he noticed that the other occupants of the car had also opened their respective car doors and were firing guns. Lee fled through an alley to a friend's house, from which he called an ambulance to the scene. He then ran to Lafayette Avenue where Bowens was lying on the ground, bleeding. Lee then returned to Port Street, where he found William Courts also lying on the ground, badly wounded. Lee left the scene without waiting for the ambulance to arrive. Later that evening, Lee did go out with David Courts in an unsuccessful

retaliatory effort to find Colkley and Fields. Two days later, Lee learned that David Courts had been shot and killed. After his arrest on July 2, 2003, Lee, through a series of photo arrays, identified both Colkley and Fields to the police as two of the May 28 shooters.

The post-mortem examination showed that Bowens had died from a single gunshot wound to the chest. At the Johns Hopkins Hospital, William Courts survived, notwithstanding having received ten gunshot wounds at point-blank range. Yvette Hollie, who was not involved with either of the drug-distributing organizations, was simply visiting with friends at 1702 Port Street when she heard "a whole lot of shots" coming from down the street. As she tried to lead a child inside the house, she was shot in the arm.

In the taped statement Qonta Waddell gave to the police on July 2, 2003, which was played for the jury, Waddell stated that he, a member of the Courts brothers group, had been standing at the top of Port Street when the Grand Marquis drove down the street and stopped. He heard James Bowens approach the car and say, "That's Pooh." He then saw four people get out of the car and start shooting. Waddell hid behind a van until the shooting was over. From photo arrays, he later identified three of the gunmen as the appellant Colkley, the appellant Fields, and Edwin Boyd, who was later murdered after Colkley discovered that he was turning over information to the police.

The taped statement that Edwin Boyd had given to the police was also played before the jury. In that statement, Boyd said that he had been a part of the execution squad that drove to Port Street under the command of Colkley. When the shooting began, Boyd himself was in a one-on-one confrontation with Broderick Campbell, a member of the Courts brothers organization, and he, Boyd, took a bullet in the eye, ultimately losing the eye.

Eric Horsey, although he did not testify at the first trial, was a key witness at the retrial. As we have already fully described in setting out the background for May 28, 2003,

Horsey testified as to Colkley's having solicited the job of hit man for both William and David Courts. He testified as to how Colkley, on the morning after the May 28 shootings, boasted about killing William Courts, describing how he had stood over Courts's prostrate body and put ten bullets in him, in his chest, stomach, side, back, hip and arm. When it was learned that William Courts was not dead, however, Horsey refused to pay Colkley for that job. In the world of Murder for Hire, the effort does not count; only the result matters. When a day or two later, Colkley reported that he had killed David Courts and that fact was then verified, Horsey paid Colkley $10,000 for the successful "hit."

The ballistics survey of the scene indicated that at least four (but possibly more) handguns had been fired, including one .45 caliber handgun, two nine millimeter handguns, and one .38 caliber or .357 caliber handgun. Except for Broderick Campbell, one of whose bullets hit Edwin Boyd in the eye, the Port Street target group was able to get off very little, if anything, by the way of defensive fire.

Neither Colkley nor Fields have challenged the legal sufficiency of the evidence to support their convictions. Their complaints are procedural.

### The Contentions

Both appellants raise the following four questions:

1. Did the trial court err in excluding "exculpatory" testimony by one of the alleged victims, William Courts, from the first trial?

2. Did the trial court err in denying appellants' request for a missing witness instruction relating to William Courts?

3. Did the trial court err in denying appellants' motion for a new trial after it was discovered that the jury conducted independent investigation during deliberations?

4. Did the trial court err in refusing to disclose to the defense Baltimore Police Department Internal Investi-

gation Division files concerning misconduct by officers who testified for the State and later in refusing to allow appellants to cross examine the officers about misconduct?

Colkley alone raises five additional questions:

5. Did the trial court err in admitting a taped statement by a witness who died prior to retrial on the ground that appellant Colkley procured his unavailability?

6. Did the trial court err in permitting the State to elicit a detective's opinion of Colkley's credibility?

7. Did the trial court err in admitting improper lay opinion testimony?

8. Must Colkley's convictions be reversed as a result of the State's failure to fulfill its discovery obligations?

9. Did the trial court impose an illegal sentence on Colkley?

Fields alone raises a single question:

10. Did the trial court impose an illegal sentence on Fields, giving him a greater sentence than he had received at his first trial?

## I. Prior Testimony of William Courts

Both appellants were convicted of conspiring to murder William Courts. Colkley was also convicted of the attempted first-degree murder of William Courts. Fields was convicted of a second-degree assault on William Courts. The targeted victim, William Courts, testified at the first trial in March of 2005. Because of his intervening conviction for perjury, however, William Courts was no longer competent to testify at the retrial in February of 2010. Because of Courts's unavailability as a witness at the retrial, both appellants offered in evidence his recorded testimony from the first trial. The State objected. Judge Russell ruled that the recorded testimony from the first trial was not admissible. The appellants now contend that they were thereby erroneously denied their right to offer

"exculpatory" testimony. This seemingly simple contention proliferates into an omnibus cluster of sub-contentions.

## A. "Exculpatory" Versus "Non–Inculpatory"

Although our first observation is by no means critical to our ultimate resolution of the larger contention, it is in our judgment worthy of note. We must raise an eyebrow at the zeal with which both appellants brandish the adjective "exculpatory." With reference to the content of Courts's earlier testimony, both appellants rely on Judge Davis's summary of that testimony in *Fields v. State*, 172 Md.App. at 504–05, 916 A.2d 357:

> Neither Courts nor Hollie identified appellants as the shooters. Courts testified that, at the time of the shooting, he was sitting by himself on the steps of a house in the middle of the 1700 block of Port Street drinking beer and Jack Daniels. Bowens or "Buck" was down the street. At some point, Courts heard a car slam on its brakes. The car was gray and had "dark tinted" windows. Someone wearing a baseball cap—*Courts did not see who as he kept his head down*—"hopped out" of the car and shot him. Courts attempted to flee, but fell to the ground and the gunman stood over him and continued shooting. Courts was later taken to Johns Hopkins Hospital, where he was treated for ten gunshot wounds to his chest, stomach, side, back, hip and arm.
>
> Courts subsequently learned that Bowens and Hollie had also been shot and that Bowens had died. *Courts did not recall Bowens saying anything to him* or to anyone in the gray car prior to the shooting. *He also was not acquainted with Colkley or Fields* and did not know why anyone, including Colkley and Fields, would want to kill him or Bowens.

(Emphasis supplied).

Unlike defense counsel, we do not interpret that testimony as "exculpatory." It was valuable to the State at the first trial, of course, because it at least helped to establish the

*corpus delicti* of the crimes. In terms of establishing the criminal agency of his assailants, on the other hand, Courts's testimony offered nothing for the self-evident reason that he had allegedly kept his head down and did not even look at his assailants. In terms of criminal agency, the testimony was neither inculpatory nor exculpatory. It was frustratingly neutral; perhaps he was keeping faith with the code of the street. In any event, William Courts did not say that Colkley shot him, but neither did he say that someone other than Colkley shot him. Nor did he say that Colkley did not shoot him. His impact on criminal agency was, for whatever reason, zero.

In *State v. Giles,* 239 Md. 458, 469, 212 A.2d 101 (1965), the Court of Appeals commented upon the necessary content of the term "exculpatory":

While we agree that evidence which is claimed to have been suppressed must be reasonably considered to be admissible and useful before suppression may be said to exist, this is not the sole test in determining when a suppression of evidence can be said to amount to a denial of due process. *Not only must the evidence withheld be admissible and useful, but it must be such, if it had been offered in evidence, as would be capable of clearing or tending to clear the accused of guilt—i.e., it must be exculpatory.* For a definition of "exculpatory" see *Dean v. State,* 381 P.2d 178 (Okl.[Crim.App.]1963).

(Emphasis supplied).

That Oklahoma case of *Dean v. State,* to which *State v. Giles* referred, offered its definition of "exculpatory" at 381 P.2d at 181:

*'Exculpatory' is* defined in Webster's Dictionary as *'clearing or tending to clear from alleged fault or guilt'.* The various jurisdictions have adhered basically to this definition. The State of Texas in the case of *Moore v. State,* 124 Tex.Cr.R. 97, 60 S.W.2d 453 [ (1933) ], said that 'Exculpatory' means clearing or tending to clear from alleged fault or guilt; excusing.' In the case of *State v. Langdon,* 46 N.M. 277,

127 P.2d 875 [ (1942) ], used the following language: 'The word 'exculpate' is employed in the sense of excuse or justification.'

(Emphasis supplied).

Our point is that all that is non-inculpatory is not thereby exculpatory, just as all that is non-exculpatory is not thereby inculpatory. The absence of a quality is not the same thing as the opposite of that quality. There is a wide "No Man's Land" of neutral connotation between the opposing verbal trench lines. The world is not necessarily black or white. In any event, this is nothing more than a passing observation on the uses and abuses of language and an affirmation that things are sometimes gray.

## B. Perjury and Testimonial Incompetence

■ As of the retrial of this case, it is indisputable that William Courts was unavailable as a witness. In the Circuit Court for Baltimore City in September of 2009, Courts was found guilty, upon his plea of guilty, of perjury. Pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 9–104, he was thenceforth incompetent as a witness. Section 9–104 provides, simply but absolutely:

"A person convicted of perjury may not testify."

See *Myers v. State,* 303 Md. 639, 643, 496 A.2d 312 (1985); *Howell v. State,* 62 Md.App. 278, 285, 489 A.2d 55 (1985).

■ The perjurious act itself had occurred back on January 28, 2002, when Courts was testifying before the juvenile court in Baltimore City. Although the fact of Court's earlier false testimony was known to both the prosecution and the defense team at the time of the first trial of this case in March of 2005, the fact of such false testimony did not *per se* render Courts incompetent as a witness at that 2005 trial. A person is rendered incompetent as a witness not by the act of perjury but only upon an actual conviction for perjury. As the Court of Appeals held explicitly in *Florentine v. State,* 184 Md. 335, 340, 40 A.2d 820 (1945):

*Before one is disqualified as a witness* under this provision, *he must be convicted "of the crime of perjury."* A witness cannot be convicted of perjury by judicial fiat. Whatever a judge may think regarding the want of truth of a witness testifying in his court, *he cannot deprive him of his right* under the law *to testify, unless that right has been destroyed by a conviction of perjury in accordance with due process of law.*

(Emphasis supplied). See also *Pullman Co. v. Ray,* 201 Md. 268, 273, 94 A.2d 266 (1953); *Crunkilton v. Hook,* 185 Md. 1, 5, 42 A.2d 517 (1945); *Erman v. State,* 49 Md.App. 605, 620–21, 434 A.2d 1030 (1981) ("Thus before one is disqualified as a witness under the provisions of § 9–104, he must be convicted of the crime of perjury."); *Vandergrift v. State,* 17 Md.App. 1, 4–6, 299 A.2d 451 (1973).

The State, to be sure, argued at the hearing before Judge Russell that Courts's testimony from the first trial should not be received in evidence at the retrial because even that earlier pre-conviction testimony was, based upon our present knowledge, just as incompetent as would be Courts's subsequent post-conviction testimony. The State, however, is absolutely wrong with respect to that theory of inadmissibility. Not yet having been convicted of perjury, Courts was undisputedly a competent witness at the first trial. Consequently, any subsequent use of that testimony would be equally competent, assuming that it otherwise qualifies for admissibility. Whether it "otherwise qualifies for admissibility," therefore, becomes our next inquiry.

## C. Rule 5–804(b)(5): Witness Unavailability Because of Party's Wrongdoing

■ Because William Courts, by virtue of his intervening conviction for perjury, was unavailable as a witness at the retrial, both appellants moved, pre-trial, to have his testimony from the first trial ruled to be admissible as an exception to the Rule Against Hearsay. The motion was made "pursuant to Maryland Rule of Criminal Procedure 5–804." Maryland Rule 5–804, of course, is an umbrella provision, embracing no

less than five separate exceptions to the hearsay rule under circumstances wherein the declarant is unavailable as a witness. The five exceptions are for 1) prior recorded testimony; 2) a dying declaration; 3) a statement against interest; 4) a statement of personal or family history; and 5) of present pertinence, a statement of a declarant who has been made unavailable as a witness because of a party's wrongdoing.

Judge Russell conducted a hearing on the merits of that motion on January 26, 2010. It was immediately clear at the hearing that the hearsay exception being argued and urged upon the court was the particular exception spelled out by Rule 5–804(b)(5)(B), which provides:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . .

(5) Witness unavailable because of party's wrongdoing.

. . .

(B) Criminal causes. In criminal cases in which a witness is unavailable because of a party's wrongdoing, admission of the witness's statement under this exception is governed by Code, *Courts Article,* § 10–901.

Maryland Code, Courts and Judicial Proceedings Article, § 10–901(a), in turn, provides:

(a) **In general.**—During the trial of a criminal case in which the defendant is charged with a felonious violation of Title 5 of the Criminal Law Article or with the commission of a crime of violence as defined in § 14–101 of the Criminal Law Article, *a statement* as defined in Maryland Rule 5–801(a) *is not excluded by the hearsay rule if the statement is offered against a party that has engaged in, directed, or conspired to commit wrongdoing that was intended to and did procure the unavailability of the declarant* of the statement, as defined in Maryland Rule 5–804.

(Emphasis supplied). Subsection (b) goes on to provide for a hearing and, in (b)(2), to allocate the burden of persuasion at such a hearing. The court will grant the exception if:

(2) The court finds by clear and convicting evidence that *the party* against whom the statement is offered *engaged in, directed, or conspired to commit the wrongdoing that procured the unavailability of the declarant.*

(Emphasis supplied).

The appellants attempted to persuade Judge Russell that the State's successful prosecution of William Courts for perjury constituted the "wrongdoing" that "procured" his unavailability as a witness. At the outset, there is a serious question as to whether the State's legally permissible and ultimately successful prosecution of a defendant for perjury could ever constitute "wrongdoing" within the contemplation of § 10–901(a) and Rule 8–504(b)(5) even if some ancillary advantage accrued to the State as a result of such a conviction. In this case, however, it is unnecessary to address that question because Judge Russell was not persuaded in the first instance that the State conspired or engaged in a plan to bring about the conviction in order to make the declarant unavailable as a witness. Whether such an endeavor, if it had occurred, could constitute "wrongdoing" within the contemplation of the rule is a question the resolution of which will have to await another day.

The appellants' argument as to causation relied exclusively on the common logical fallacy of *post-hoc, ergo propter hoc.*[1] The argument was that because Courts's perjury prosecution came years after his false testimony had occurred but shortly after the appellants announced their intention to call Courts as a witness at the retrial, the perjury prosecution must have been designed to preclude his testifying. It, to be sure, was a plausible argument. Live witnesses, however, prevailed over the allure of "post hoc, ergo propter hoc" speculation. The appellant called all three witnesses at the hearing. The key witness was Assistant State's Attorney Nancy Olin, who handled the perjury prosecution. She testified that she first began considering the perjury prosecution at the "end of 2007"

---

1. After this; therefore, because of this.

after discussing the matter with a colleague in the United States Attorney's Office. She further testified that at that time she was not even aware that Courts was a potential witness in a case against the appellants. When she first learned of that situation, she immediately notified Deputy State's Attorney Haven Kodak, and the two of them then contacted Assistant State's Attorney Gerard Volatile, who had been assigned the present case against the appellants. Ms. Olin testified, "Mr. Volatile said, 'Do whatever you know you have to. That's your case. That's fine.'" She further testified that she was unaware of the fact that Courts might be called as a defense witness. She proceeded with her prosecution of Courts for perjury.

Mr. Volatile was also called as a witness by the appellants. He confirmed Ms. Olin's testimony in every detail. He advised Ms. Olin that she should "not let his case have anything to do with her case." He expressly denied any plan or scheme to generate the perjury prosecution as a device to render Courts unavailable as a witness for the appellants.

The third and final witness was Ivan Bates, the defense attorney who represented Courts in the perjury case. When at one point he spoke to Volatile about the perjury case, Volatile told him, "Your boy is a liar and, you know, Nancy is going to do what Nancy is going to do." With respect to Volatile's influence on the perjury prosecution, Bates's conclusion was that "it really wasn't in Gerry's [Volatile's] hands." Bates further testified that he never mentioned to Ms. Olin that the appellants intended to call Courts as a defense witness.

Not a single witness testified to any conspirational design or purpose within the State's Attorney's Office to prosecute Courts for perjury in order to render him unavailable as a witness in the present case. At the hearing, counsel for the appellant Colkley even conceded, "Ms. Olin is driving her own van." He expressly stated that he was not accusing her of any wrongdoing. Where then was the element of "wrongdoing" within the contemplation of Rule 5–804(b)(5)? The burden, of

course, was allocated to the appellants to persuade Judge Russell of the State's "wrongdoing" by clear and convincing evidence. Judge Russell's ruling was loud and clear:

*Based upon the testimony* and evidence that I have ended up receiving in this case and given the standard in this case, namely clear and convincing evidence, *I do not believe that . . . the Defendants have met their burden of establishing clear and convincing evidence for conspiring or directing to commit wrongdoing intended to establish the unavailability of the witness in this matter by prosecuting or convicting him of perjury* in the case. As a result, I will end up denying the motion *in limine* to read the previously given testimony of Mr. Courts.

(Emphasis supplied).

Judge Russell's non-persuasion was not clearly erroneous. The appellants' effort to qualify Courts's testimony from the first trial pursuant to Rule 5–804(b)(5) failed.

### D. Rule 5–804(b)(1): The Road Not Taken

▮ The appellants would now like us to believe that Rule 5–804(b)(1) was the exception to the Rule Against Hearsay that they invoked. It was not. In the cold light of dawn, there are always rueful afterthoughts of what might have been done differently. If the trial could only be replayed, Rule 5–804(b)(1) now looks far more attractive to the appellants as a qualifying possibility than does Rule 5–804(b)(5). The problem is that the trial cannot be replayed. As the first of Rule 5–804(b)'s hearsay exceptions, (b)(1) is the familiar and classic hearsay exception for "Former Testimony." Rule 5–804(b)(1) provides:

(1) *Former testimony.* Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

If the appellants had sought to avail themselves of this hearsay exception, it does appear that it would have worked admirably. It, however, was not the exception urged before Judge Russell and admissibility pursuant to it has not, therefore, been preserved for appellate review.

In terms of preservation, the appellants protest ardently that they preserved their invocation of § 5–804(b)(1) for appellate review because they at least used the inclusive term " § 5–804." Rule 5–804 is, of course, a genus, not a species. Adjectivally, that makes it generic rather than specific. Preservation favors specificity. The appellants might as readily protest that they invoked Rule 5–804(b)(1) by citing generally to "the exceptions to the rule against hearsay." A finer calibration than that, however, is required. The nationally acclaimed lecturer on the law of evidence, Professor Irving Younger, regularly reminded us that "a claim that says everything is a claim that says absolutely nothing."

The trial judge is not consigned to a defense-designed treasure hunt for hidden meaning. Nor need he probe psychoanalytically into what defense counsel meant to say while saying something else. He need not figure out what a "C" paper might have said, had it been an "A" paper. In terms of unadulterated clarity, a legal motion in a trial court, as Theodore Roosevelt once said of a political speech, "should be a poster and not an etching." Shadings and adumbrations have no place.

From the beginning of the hearing on the motion to its conclusion, counsel for the appellants argued expressly in terms of Rule 5–804(b)(5) and the closely related § 10–901. Section 5–804(b)(1) was never mentioned. The hearsay exception for "Former Testimony" was never mentioned. Three witnesses were called by the appellants. Each was questioned closely about the circumstances of the perjury prosecution. Counsel for Colkley stated expressly that his argument was being made "pursuant to 10–901," and that he was "going under 10–901." Counsel further explained that the resolution of the motion was governed by the "clear and convincing"

standard. That, of course, is the standard of persuasion applicable to § 5–804(b)(5), but a standard that has no applicability to § 5–804(b)(1). Judge Russell's analysis and his ultimate ruling dealt exclusively with § 5–804(b)(5) and that exclusivity did not prompt a murmur of protest from the appellants. Their present claim that § 5–804(b)(1) was somehow before the court is a fantasy. *See State v. Northam*, 421 Md. 195, 206, 26 A.3d 344 (2011); *White v. State*, 23 Md.App. 151, 155–56, 326 A.2d 219 (1975), *cert. denied*, 273 Md. 723 (1975). We see no error.

### E. Punting on Third Down: The Ineffective Assistance Claim

With less than redoubtable confidence in their primary deployment, the appellants quickly fall back to a secondary defensive line. They now claim that if predecessor counsel failed to preserve the argument for admissibility pursuant to Rule 5–804(b)(1), then predecessor counsel, *ipso facto*, rendered ineffective assistance pursuant to the Sixth Amendment as measured by the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Ordinarily, we would fully agree with the State that a claim of ineffective assistance should be resolved not on direct appeal but should be fully thrashed out in a post-conviction proceeding. "[A] claim of ineffective assistance of counsel generally should be raised in a post-conviction proceeding." *Smith v. State*, 394 Md. 184, 199, 905 A.2d 315 (2006). "[D]irect review is an exception that applies only when 'the critical facts are not in dispute and the record is sufficiently developed to permit a fair evaluation of the claim.' " *Mosley v. State*, 378 Md. 548, 566, 836 A.2d 678 (2003) (quoting *In re Parris W.*, 363 Md. 717, 726, 770 A.2d 202 (2001)).

In this case, however, we find ourselves in full agreement with the appellants that "relegating [their] ineffective assistance of counsel claim[s] to post-conviction proceedings would serve no useful purpose and would be a waste of judicial

resources." The Sixth Amendment claim is so transparently devoid of merit that we do not hesitate to reject it here and now. As we have already discussed, the prior testimony in issue was not exculpatory and a lawyer's disinclination to push for its admissibility would not, we hold, have been a failure to satisfy the performance prong of *Strickland v. Washington.* This innocuous bit of prior testimony, moreover, would not, in our judgment, have budged the trial result discernibly in either direction. Because the testimony in question would not materially have helped the appellants at their retrial, therefore, the absence of such testimony would not satisfy the prejudice prong of *Strickland v. Washington.* Failing both of *Strickland*'s prongs, this secondary contention is twice bereft. We fully agree with the appellants that it would be a waste of judicial resources to require any further adjudication of this issue by a postconviction proceeding.

## II. The Missing Witness Rule

Contention No. 2 is only the Ghost of Contention No. 1, reappearing in a subtly altered guise. The convicted perjurer, William Courts, is also the star and title character of "The Missing Witness" controversy. The appellants argue that the jury should have been instructed that, because of the failure of the State to have called Courts as a witness, the jury could infer that Courts's testimony would have been unfavorable to the State.

Maryland State Bar Association, Maryland Pattern Jury Instructions–Criminal 3:29 states in pertinent part:

> If a witness could have given important testimony on an issue in this case and *if the witness was peculiarly within the power of the State to produce, but was not called as a witness by the State* and the absence of that witness was not sufficiently accounted for or explained, then *you may decide that the testimony of that witness would have been unfavorable to the State.*

(Emphasis supplied).

In *Christensen v. State,* 274 Md. 133, 134–35, 333 A.2d 45 (1975), Judge Smith quoted with approval from 1 Underhill,

*Criminal Evidence* (rev. 6th ed., P. Herrick 1973), § 45 in giving us what has, ever since, been Maryland's formulaic statement of the Missing Witness Rule:

> The failure to call a material witness raises a presumption or inference that the testimony of such person would be unfavorable to the party failing to call him, but *there is no such presumption or inference where the witness is not available, or where his testimony is unimportant* or cumulative, *or where he is equally available to both sides. The presumption or inference* that the testimony of a missing witness would be unfavorable *is applied most frequently when there is a relationship between the party and the witness, such as a family relationship, an employer-employee relationship, and sometimes, a professional relationship.*

(Emphasis supplied). *See also Robinson v. State,* 315 Md. 309, 314–15, 554 A.2d 395 (1989); *Wilson v. State,* 148 Md. App. 601, 654 n. 22, 814 A.2d 1 (2002); *Woodland v. State,* 62 Md.App. 503, 508–11, 490 A.2d 286 (1985).

## A. As to Fields: Non–Preservation

■ Simply to reduce the clutter, we observe initially that with respect to the appellant Fields, his contention that Judge Russell erroneously failed to give a "Missing Witness" instruction to the jury is dead in the water. Fields never requested such an instruction. Fields never objected, after jury instructions had been given, that no such instruction had been included. Although Fields in his brief deftly refers not to what "he sought" in terms of the instruction but rather to what "the defense sought," piggy-backing is not allowed. A silent Fields may not rely on the request made and the objection lodged by co-defendant Colkley. In *Evans v. State,* 174 Md.App. 549, 566, 922 A.2d 620, *cert. denied,* 400 Md. 648, 929 A.2d 890 (2007), Judge Davis was loud and clear:

> The record clearly demonstrates that *appellant's counsel failed to object* to the instruction at issue during the proceedings. In his brief, *appellant relies solely on the objection raised by codefendant's counsel.* However, *a bedrock*

*principle of Maryland law is that a defendant may not rely on an objection made by a codefendant for the purpose of raising an appeal as to that issue.*

(Emphasis supplied). *See also Cooley v. State,* 385 Md. 165, 181 n. 7, 867 A.2d 1065 (2005); *Hensen v. State,* 133 Md.App. 156, 165, 754 A.2d 1055 (2000); *Ezenwa v. State,* 82 Md.App. 489, 572 A.2d 1101 (1990).

## B. The Rule Turned Upside Down

■ Even as to Colkley, this entire scenario, from the outset, is inappropriate for invoking the Missing Witness Rule. Except in the most hypertechnical sense, William Courts is not missing. Presumably, everyone knows where he can be found. It is simply the case that he is incompetent, as a matter of law, to give testimony as a witness.

In view of the defense proffer that Courts's testimony would be "exculpatory" and the express defense desire to have his testimony available, it seems to have been the defense that would have liked to call him. It is, therefore, arguable that the State might seek to exploit the inability of the defense to produce an ostensibly exculpatory witness and to invoke the Missing Witness Rule for its own benefit, by requesting an instruction that from Courts's absence the jury might infer that Courts's testimony would have been unfavorable to the defense. Such a posture by the State, of course, would be absurd. It is equally absurd on the part of the defense. This is simply not a Missing Witness Rule situation. Both parties can summon Courts to the trial if they wish to do so, but he will, as a matter of law, not be permitted to testify once he gets there.

The defense protest that the rule has to be applied, if against anybody, against the State because it was the State that was responsible for Courts's unavailability as a witness is nothing more than the ghost of Contention No. 1. That specter has already been laid to rest. The State bears no blamable responsibility for Courts's legal incompetence as a witness. That is something he did to himself.

## C. The Merits Could Not Be Satisfied In Any Event

Even if, *arguendo,* the merits of the Missing Witness Rule were properly before us, Colkley could not satisfy them. In *Pinkney v. State,* 200 Md.App. 563, 578–79, 28 A.3d 118 (2011), Judge Watts succinctly laid out the requirements for invoking the Missing Witness Rule:

> "[T]he missing witness rule applies where (1) *there is a witness, (2) who is peculiarly available to one side and not the other,* (3) whose testimony is important and non-cumulative and will elucidate the transaction, and (4) who is not called to testify." *A "relationship" between a party and a witness in the missing witness instruction context generally refers to a "family relationship, an employer-employee relationship,* and, sometimes, a professional relationship" ... In this case, there was no relationship between the witness and the State. A police officer took the witness's name and had no further contact with her.

(Emphasis supplied). *See Woodland v. State,* 62 Md.App. 503, 510, 490 A.2d 286 (1985).

In this case, even assuming that a convicted perjurer could be categorized as a potential "witness," William Courts was not "peculiarly available to one side and not the other." Courts was equally available, or equally unavailable, to the State and to Colkley alike. As both *Christensen v. State,* 274 Md. at 134, 333 A.2d 45, and *Robinson v. State,* 315 Md. 309, 321, 554 A.2d 395 (1989), point out, the inference arising from the Missing Witness Rule "cannot be drawn when the witness is unavailable." It is highly doubtful, moreover, that Courts's hypothetical testimony could be characterized as "important" or as something that would elucidate the question of Colkley's criminal agency one way or the other. It is then questionable whether any party could be faulted for not calling a witness when everyone knows that the witness is not competent to testify. It is furthermore clear that the State was not in either a family relationship or an employer-employee relationship with William Courts. The traditional preconditions for

the Missing Witness Rule were not in any way satisfied in the instant case.

## D. It Is Never Error Not to Instruct

 Although it is sometimes error for a judge to give a Missing Witness Rule instruction where its preconditions have not been satisfied, *Christensen v. State,* 274 Md. at 134, 333 A.2d 45, it is never error for a court, in its discretion, not to give the Missing Witness Instruction. Judge Cathell thoroughly explored for the Court of Appeals this unlimited discretion in *Patterson v. State,* 356 Md. 677, 684–85, 741 A.2d 1119 (1999):

> *Because most evidentiary inferences are questions of fact, not questions of law, missing evidence instructions can be distinguished from instructions on the elements of the crime* that a defendant is charged with, instructions on the affirmative defenses that a defendant may utilize, and from evidentiary presumptions that the law recognizes but, without an instruction, a jury would not recognize. Elements, affirmative defenses and certain presumptions relate to the requirement that a party meet a burden of proof that is set by a legal standard. *An evidentiary inference, such as a missing evidence or missing witness inference, however, is not based on a legal standard but on the individual facts from which inferences can be drawn* and, in many instances, several inferences may be made from the same set of facts. A determination as to the presence of such inferences does not normally support a jury instruction. *While supported instructions in respect to matters of law are required upon request, instructions as to evidentiary inferences normally are not.*

(Emphasis supplied).

In *Keyes v. Lerman,* 191 Md.App. 533, 546, 992 A.2d 519 (2010), Judge Wilner (specially assigned) wrote to a similar effect:

> *Whether,* in given circumstances, *an unfavorable inference may be drawn from missing evidence or witnesses is a*

*matter of fact, not law, and the court is under no obligation to give an instruction on the matter. It may do so,* and in certain circumstances perhaps it should do so, *but,* as clearly stated in *Patterson, failure to do so is not error or an abuse of discretion.*

(Emphasis supplied).

In *Dansbury v. State,* 193 Md.App. 718, 743, 1 A.3d 507 (2010), Judge Hollander was writing exclusively with reference to the unlimited discretion of a trial court not to give a Missing Witness Instruction even when the facts would justify the giving of the instruction:

> *The trial judge has discretion to* grant or *deny the instruction "when the facts would support the inference." Robinson,* 315 Md. at 319 n. 7 [554 A.2d 395]. *Conversely, there is "no discretion to grant the instruction where the facts do not support the inference." Id. See Patterson v. State,* 356 Md. 677, 688, 741 A.2d 1119 (1999) ("[A] missing evidence instruction generally need not be given; *the failure to give such an instruction is neither error nor an abuse of discretion."*). As this Court recently said, "the court is under no obligation to give an instruction on the matter. It may do so, and in certain circumstances perhaps it should do so, but ... failure to do so is not error or an abuse of discretion." *Keyes,* 191 Md.App. at 546 [992 A.2d 519].

(Emphasis supplied). *And see Robinson v. State,* 315 Md. at 319 n. 7, 554 A.2d 395 ("*We do not suggest that a trial judge would err in refusing to give a missing witness instruction even when the facts would support the inference* ... The discretion that is present in the trial judge is the discretion to grant or deny the specific instruction when the facts would support the inference."). (Emphasis supplied). On this issue, the abuse of discretion is a one-way street. It is sometimes an abuse of discretion to give a Missing Witness instruction. It is never an abuse of discretion not to give a Missing Witness instruction. For all of these reasons, there was no error in Judge Russell's disinclination to give a Missing Witness instruction.

### III. Jury Misbehavior and Mistrials

 Our intent is to keep our consideration of this contention rigidly within the limited confines of the single instance of relatively minor jury misbehavior of which there is actual, historical evidence. We will not join the defense in engaging in untethered speculation about theoretically conceivable errors of which there is no evidence but which, of course, are always possible in a fallible world.

At a certain point during the jury's deliberations, a note from the jury asked, "Can we get a dictionary?" Judge Russell initially proposed to counsel that he tell the jury that it would have to rely on the evidence that had been presented and on the law as to which it had been instructed. Although no one objected to that proposed response, the prosecutor suggested that the jury be given a dictionary. Counsel for the appellant Fields recommended giving the jury a Webster's dictionary. The court then took a recess while Fields's counsel retrieved a copy of Webster's dictionary from her office. When proceedings resumed, counsel for Colkley initially expressed an objection to giving a dictionary to the jury, but withdrew the objection after counsel for Fields argued, "I just think it's a simple word, which is 'related,' and it really helps both people."

For present purposes it is important to note that at that point, all parties were agreed that nobody had any objection to the jury's receiving a dictionary so that it could look up the meaning of a word. By general agreement of all the parties, that in itself would not have constituted prejudice. Just at that point, however, the court received another note from the jury on a totally unrelated subject, along with the oral communication (presumedly through the clerk) that "we don't need a dictionary anymore; we already looked it up." Perhaps the jury invoked Noah Webster electronically rather than in hard copy. That is the sum total of everything we know about any arguable jury impropriety. That is the exclusive basis for the subsequent motions for a mistrial.

It is easy, however, to lose sight of that point. Counsel for the appellants reacted to the revelation that "we looked it up" as if the trial had struck an iceberg. Counsel for Fields speculated that one of the jurors might well have used a cell phone, because none of the parties had requested that the jurors' cell phones be collected. Building on that speculation, counsel for Colkley then expressed the further fear that if the jurors were "looking things up" (the "things" being looked up were now being referred to in the plural), they might be exposing themselves to publicity about the case. By way of requested relief, counsel for Colkley asked 1) that the jury be reinstructed that "they're not supposed to be looking up anything or doing any of their own research of anything on the phone," and 2) that the court "take their phones away." Judge Russell did not order that the phones be confiscated, but he did give the following re-instruction to the jury:

> I want to make sure that I convey to you that *there shouldn't be any independent research or investigation of the case whatsoever.* You make your decision exclusively based upon the evidence and the instruction of the law that I provided to you in this case.

(Emphasis supplied).

As of that reinstruction, the ruffled trial feathers seemed to settle down a bit and the jury deliberations calmly resumed. It was but a lull before the storm. As the court prepared to break for lunch, the judge was routinely explaining the luncheon break rules when one of the juror's cell phones rang out and jangled the already frazzled nerves in the courtroom. After a peremptory, "Turn that thing off," and a supplemental, "Take the battery out or something," Judge Russell repeated his earlier instruction not to "engage in any independent research or investigation." Counsel asked for another reinstruction after the lunch break about not using cell phones during deliberations. Judge Russell declined, ruling that "my admonition to that particular juror will be satisfactory."

After the jury resumed its deliberations later that afternoon, however, each appellant moved for a mistrial. Specula-

tion as to what might have happened had continued to ferment and grow exponentially. Although counsel for Fields had initially posited that the jury wanted to look up the meaning of the word "relate," she now expressed the fear that the jury wanted to look up a definition of "conspiracy." Counsel for Colkley, on a higher trajectory, theorized that there had been a significant amount of pre-trial publicity about the case including media coverage of the unrelated murder of a witness and expressed the fear that the jurors (again in the plural) may have used their cell phones (plural) to access the internet or to call someone not on the jury for information. Counsel for Fields was concerned not with what the jury had done but with what it might have done. She noted that looking up a word is one thing but that going on the internet was an entirely different matter as "I can go on the internet and look up anything I want, legal or whatever." Thus, mighty oaks from little acorns grow. The cold reality, however, was only "three to five minutes" had elapsed between the jury's initial request for a dictionary and its oral announcement that "we have already looked it up."

Counsel for both appellants, moreover, indicated that they had no desire that the jury should be voir dired about having looked up the meaning of a word.[2] On the spectrum of arguable improprieties, this was about as minimal as an impropriety can get. It clearly was not the type of "excessive or egregious misconduct" that would give rise to a presumption of prejudice, *Dillard v. State*, 415 Md. 445, 457, 3 A.3d 403 (2010), a presumption that frequently can only be rebutted by a voir dire examination of the jury. Nor was this what Judge Barbera in *Johnson v. State*, 423 Md. 137, 149, 31 A.3d 239

---

2. When Judge Russell asked counsel if they thought a voir dire of the jury might be appropriate, he got the following response:
> [FIELDS'S COUNSEL]: *No, I wasn't asking for voir dire.* We have to just make the record Your Honor, that's all.
> [THE COURT]: Okay, very well. Mr. Garcia, *anything additional that you would like to add?*
> [COLKLEY'S COUNSEL]: *That's it.*
> (Emphasis supplied).

(2011), characterized as "serious juror misconduct," giving rise to a presumption of prejudice. In *Bruce v. State,* 351 Md. 387, 396, 718 A.2d 1125 (1998), the Court of Appeals made it clear that a trial court, in its discretion, is under no obligation to investigate a mere speculation about possible jury prejudice:

> The trial judge in the case sub judice found that there was no reasonable likelihood that any of the jurors had seen the potentially prejudicial information contained upon the electronic bulletin board, and that finding was supported by the evidence; consequently, *he did not abuse his discretion in refusing to voir dire the jurors to investigate Bruce's speculation that the jury had been tainted* by such exposure.

(Emphasis supplied).

With respect to the motions for mistrial, Judge Russell ruled:

> All right. I am persuaded by the [S]tate's argument in this case. *I don't think that* at this point in time that *there's been a demonstration of sufficient prejudice at this point in time to be grounds of a mistrial. I have admonished them subsequent to the receiving notice of the information.* And I can only assume, and want to assume, that they will follow the Court's instructions in the case. So as a result, I'll go ahead and deny the motion at this point.

(Emphasis supplied).

We see no error. Let it be clear that the jury, on its own, should not have looked up the meaning of a word.[3] Without countenancing what the jury did on its own initiative, however, if a mistake this relatively minor could precipitate a mistrial, the criminal justice system would collapse. As *Johnson v. State,* 423 Md. at 149, 31 A.3d 239, reminds us, "[N]ot all juror misconduct necessarily implicates the defendant's right to a fair trial by an impartial jury." This was a second trial, seven

---

**3.** If one of the twelve jurors, on the other hand, had been an unusually erudite master of the English language, that would be another matter. An erudite juror would be, of course, an internal resource, not an external resource.

years after the commission of the original crime. This "glitch" occurred after 11 hard fought trial days. If something of this feeble a magnitude were deemed to be reversible error, 95% of all hotly contested cases would never cross the finish line unscathed. One does not "abandon ship" after striking a piece of driftwood, even if, ideally, one should have missed the driftwood.

### IV. Confidential Police Personnel Files

Two of the State's witnesses against the appellants were Sergeant Darryl Massey and Detective Kerry Snead of the Baltimore City Police Department. In an effort to obtain information that might have been used to try to impeach the testimonial credibility of the two witnesses, the appellants filed, pre-trial, a motion for a subpoena for files of the Baltimore Police Department Internal Investigation Division ("IID") pertaining to an alleged investigation by the IID into an instance of arguably improper behavior on the part of the two officers. The Police Department responded with a motion to quash the subpoena on the grounds that the appellants were not entitled to the confidential IID files and alleging that the appellants were on "an unwarranted fishing expedition."

We begin our analysis with Maryland Code, State Government Article, § 10–616(i), which states in pertinent part:

> [A] custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information.

Police department records about internal investigations clearly fall within the coverage of § 10–616(i). As the Court of Appeals held in *Montgomery County v. Shropshire,* 420 Md. 362, 365–66, 23 A.3d 205 (2011):

> We shall hold that *records of an internal investigation pertaining to the alleged violation of administrative rules are "personnel records" pursuant to Section 10–616(i) of the State Government Article* and, therefore, may not be dis-

closed under the Maryland Public Information Act to the Montgomery County Inspector General.

(Emphasis supplied). *See also Robinson v. State,* 354 Md. 287, 730 A.2d 181 (1999).

Writing for this Court in *Baltimore City Police Department v. State of Maryland,* 158 Md.App. 274, 857 A.2d 148 (2004), Judge Barbera first gave an overview:

> Personnel records are included among those documentary materials that qualify as public records under the Act. Yet, *personnel records are exempt from disclosure under SG § 10–616* of the Act. Specifically, SG § 10–616(a) declares: "Unless otherwise provided by law, a custodian shall deny inspection of a public record, as provided in this section." And subsection (i) provides: "(1) Subject to paragraph (2) of this subsection[, which permits disclosure to the person in interest, i.e., the employee or an elected or appointed official who supervises the employee's work], a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information." *The purpose of treating personnel records as confidential is " 'to preserve the privacy of personal information about a public employee that is accumulated during his or her employment.' "*

158 Md.App. at 282, 857 A.2d 148. (Emphasis supplied).

Under certain limited circumstances, those otherwise confidential files may be revealed. Judge Barbera carefully explained the procedures that must be followed for confidentiality to be breached:

> *Documents claimed to be privileged remain " 'presumptively privileged even from in camera inspection.' " Id.* at 365 [633 A.2d 455] (citation omitted). *" 'The burden is on the party seeking production to make a preliminary showing that the communications or documents may not be privileged or, in those cases where a weighing approach is appropriate, that there is some necessity for production.' " Id.* (citation omitted). If the requesting party has failed either to establish that the documents claimed to be privi-

leged are in fact not privileged, or to show a need for documents that are privileged, the court directs that there be no disclosure. *Id.*

*If that initial burden has been met by the requesting party, then the court* " '*should order an in camera inspection.* Depending upon the issues and circumstances, *the in camera inspection may be utilized* to determine whether the material is privileged, to sever privileged from non-privileged material if severability is feasible, and *to weigh the government's need for confidentiality against the litigant's need for production.' " Id.* at 365–66 [633 A.2d 455] (citation omitted). So, "there are ... occasions on which the trial judge must make an in camera inspection of [the] records despite the fact that they contain information about privileged communications." *Id.* at 366 [633 A.2d 455].

With regard to counsel's demand to be present at such in camera review, we made clear in *Reynolds* that counsel's presence is not always mandated. *Rather, that decision is for the trial court to make:* " '*The court may elect to review the records alone, to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court,* subject to such restrictions as the court requires to protect the records' confidentiality.' "

158 Md.App. at 288–89, 857 A.2d 148. (Emphasis supplied). *See also Reynolds v. State,* 98 Md.App. 348, 367, 633 A.2d 455 (1993).

A hearing on the appellants' motion and the Police Department's motion to quash was held before Judge Timothy J. Doory on August 4 and August 6, 2009. Judge Doory determined that he would conduct an *in camera* inspection of the documents alone. At that hearing, counsel for Colkley revealed what he already knew about the internal investigation and why he wanted the records in order to use them for impeachment purposes:

*It appears* from 2006, IID Complaint 20061328, Detective Snead and Detective Massey *were found facts sustained,* I believe is the correct terminology for and I'll quote, *commit-*

*ted and conspiring to commit theft by deception by submit-*
*ting fraudulent, daily, and court overtime slips between*
*January 1, 2006 and January 31, 2007.* There are a
number of investigatory reports showing where they say
they are and where an officer was following them actually
saying they are. There are reports. There's surveillance
done on the officers and there is a fact sustained finding by
that investigating officer to that effect and to be even more
specific, I identified the IID Complaint which is 13282006.

(Emphasis supplied).

At the hearing before Judge Doory, counsel for the Police
Department explained that a preliminary finding of "facts
sustained" by a police investigator, however, is not an ultimate
finding that the officers were guilty of the offense charged. It
is rather a preliminary determination that there is, in effect,
enough probable cause for the hearing to go forward. When
counsel for Colkley insisted that "in this case here, the facts
are found that the facts actually occurred," Judge Doory
explained, "No, sir. No, sir. Probable cause was found that
they occurred. They were charged. That's probable cause."
He concluded that the files could not "properly be used in
defense." A letter from the Police Commissioner, dated June
22, 2009, revealed that the IID cases against Massey and
Snead had been "administratively closed." At the end of the
hearing, Judge Doory ruled:

> Counsel, I have reviewed the files and there is nothing else
> of any note in the summaries. I think I have been absolved
> of making an interesting legal decision about a pending
> charge of which the world is aware. I think you have as
> much information as you're going to get. You can use that
> for whatever purposes you think is available at trial.

When counsel for Colkley further requested permission to
view the files himself, Judge Doory refused the request,
explaining that "the officers are protected by privacy . . . and
only if in fact the action is formally found to have happened
and that a penalty is necessary under the circumstances do I
believe . . . that the veil of privacy should be pierced." As

*Parker v. State,* 408 Md. 428, 437, 970 A.2d 320 (2009) pointed out, "When the trial judge's ruling involves a weighing," the review is under "a deferential abuse of discretion standard." We see no abuse of discretion in Judge Doory's ruling in this case.

 A related subcontention involved the trial itself. Prior to calling Sergeant Massey and Detective Snead as witnesses at trial, the State moved *in limine* to preclude the defense from "making any reference to anything related to that investigation, that Trial Board, that hearing however it's characterized, any reference to the records to which they were not entitled." Judge Russell granted the motion pursuant to Maryland Rule 5–608(b). That rule provides:

(b) *Impeachment by examination regarding witness's own prior conduct not resulting in convictions.* The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. *Upon objection,* however, *the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred.* The conduct may not be proved by extrinsic evidence.

(Emphasis supplied).

Judge Russell ruled that the defendants could not establish a factual basis for the conduct that was the basis for the IID investigation. Judge Russell ruled emphatically:

[THE COURT]: I want to make perfectly clear. I don't know whose taking the witness. *There should not be any mention of the Internal Affairs records,* allegations, *any information on impeachment of these individual witnesses that was covered by Judge Doory's previous order.* It shouldn't even be posed in a question and *if counsel believes that they are going there in any fashion, shape or form,*

*they need to approach this bench and we need to talk about it before that question is even asked.*

(Emphasis supplied).

That ruling is fully in line with *Thomas v. State,* 422 Md. 67, 77, 29 A.3d 286 (2011), as it holds:

> We have ... been steadfast in holding that *mere accusations of crime or misconduct may not be used to impeach.* The rationale for this viewpoint is obvious ... [A]ccusations of misconduct are still clothed with the presumption of innocence and receiving *mere accusations for this purpose would be tantamount to accepting someone else's assertion of the witness' guilt and pure hearsay.*

(Emphasis supplied). We see no abuse of discretion.

### V. Dead Men Tell No Tales, Or Do They?

■ This fifth contention is raised by Colkley alone. With it, we get to revisit Maryland Rule 5–804(5) and its relatively uncommon exception to the Rule Against Hearsay for a statement of a declarant rendered unavailable as a witness by the wrongdoing of the opposing party. Unlike our encounter with the exception in Contention No. 1, on this occasion, the parties are in opposite postures and on this occasion we reach an opposite result. The modality that rendered the witness unavailable in that earlier contention was a conviction for perjury. The modality on this occasion is the murder of the declarant.

The criminal shootings on trial in this case took place on the evening of May 28, 2003. Edwin Boyd, the now dead hearsay declarant, was 17 years-of-age at the time of the shootings. He was a confederate of Colkley and a member of the attack team. In his later taped statement to the police, he stated that he had driven to the scene of the May 28th shootings in a "dark grayish Crown Vic" with Colkley and with two other men (one of whom was Brian "Bee" Smith). When they arrived at the target area in the 1700 block of Port Street, Colkley and one of the other men got out of the car and started talking with William Courts, James Bowens, and two others. Boyd

himself went to talk with Broderick Campbell, an associate of both Courts and Bowens, who was standing across the street. When the gunfire erupted, Campbell pulled out a gun and began firing at Boyd, hitting him in the left eye. Boyd fled from the scene on foot, throwing his own gun into a sewer en route.

Boyd came to the attention of the police later that night when he admitted himself to a hospital, seeking treatment for the gunshot wound to the left eye. A gunshot residue test of his hands was positive for his having fired a weapon. Boyd spoke with the police again on June 13, 2003, and it was then that he gave his taped statement to Sergeant Lisa Robinson and Detective Snead, implicating himself and the appellant Colkley in the attack on May 28, 2003. On June 30, 2003, however, Jack Rubin, Esq., the attorney for Boyd, telephoned Sergeant Massey and informed him that Boyd no longer had anything to say about the shooting and did not wish to talk about it with Sergeant Massey any further.

Detective Ray Hunter testified that at 11:25 p.m. on July 9, 2003, Edwin Boyd was shot and killed in the 2300 block of East Oliver Street. Although a man named Sedgewick Stansle was convicted of the murder, the investigating officers believed that an unidentified second person was involved. There was no apparent motivation for the murder.

The unavailability of Boyd as a witness being indisputable, the State offered his taped statement of June 13, 2003, pursuant to Maryland Rule 5–804(b)(5) and Courts and Judicial Proceedings Article, § 10–901(a).[4] In establishing its entitlement to rely on a Rule 5–804(b)(5), the State relied primarily on the testimony of Eric Horsey. Horsey was not simply a confederate of Colkley but was, in fact, his criminal employer. Horsey was, by his own admission, the king-pin of a large-

---

4. It is arguable that Boyd's taped statement incriminating himself and Colkley was also admissible pursuant to Rule 5–804(b)(3), as a statement against penal interest. *See Jacobs v. State,* 45 Md.App. 634, 641–53, 415 A.2d 590 (1980). There was abundant corroboration, as is required by Rule 5–804(b)(3).

scale narcotics distribution operation in East Baltimore, netting him between $25,000 and $30,000 per month prior to his federal arrest on drug conspiracy charges in 2006. It was, indeed, Horsey who financed and put out murder contracts on several persons during the ongoing drug wars of which May 28, 2003 was a part. Among the contract killers utilized by Horsey were both the appellant Clayton "Coco" Colkley and Brian "Bee" Smith.

In order to assess the admissibility of some of Horsey's testimony at the motions hearing for the admissibility of Boyd's taped statement, it is important to take note of some of the participants in the drug conspiracy master-minded by Horsey and its overarching purpose and *raison d'être*. Its aims included not only selling drugs to consumers but also eliminating rival sellers, as well as avoiding detection and prosecution. An earlier skirmish in the war between the Horsey organization and the rival group operating in the vicinity of Port Street and Lafayette Avenue occurred in January of 2003, a full five months before the shootings on May 28. On that earlier occasion, a man identified by Horsey as "Will from Port Street" shot Horsey's brother and killed Horsey's best friend in front of a Teamsters' Hall in Baltimore City. Over the course of the next month, Horsey himself shot "quite a few individuals" in the area of Port Street and Lafayette Avenue in a violent, if unsuccessful, effort to get revenge.

It was in March of 2003 that Colkley entered the picture when he approached Horsey and offered to kill both William Courts and his brother, David Courts, for a price. Colkley stated to Horsey that the job would be easy because he was from an area only several blocks away from the area "worked by" the Courts brothers. Horsey agreed, on the condition that Colkley keep the arrangement only to himself. Horsey contacted Colkley the next day, however, and ostensibly called off the deal, angry because word had gotten out that he had put a bounty on the Courts brothers. Colkley insisted that he had not leaked the information and again offered to do the job. Horsey replied that he was going away for the weekend and

that if Colkley could not do the job by Monday, he should forget about it.

Horsey and Colkley did not speak about the matter again until "sometime in May of 2003," presumably after May 28, 2003, even though Colkley had begun buying drugs from Horsey in the meantime. One night while Horsey was out to dinner with his wife, Colkley called him to tell him about "something he had done." When they met the next morning, Colkley claimed to have killed William Courts and another unnamed individual. Horsey insisted that he would have to check the accuracy of that account before paying Colkley for the job. He learned that William Courts, miraculously, was still alive at the Johns Hopkins Hospital. Colkley, chagrined, offered to settle for half the fee. Horsey still refused to pay. In describing the attack on Port Street, Colkley acknowledged to Horsey that Brian "Bee" Smith had been, along with Boyd and a man named Guy Pruitt, one of the men with him as they "started shooting at everybody that was in the block." He further explained that as William Courts lay on the ground, he stood over him and put multiple bullets into him. Horsey remained firm that "almost dead" does not count.

Colkley's success rate got better the next day, however, as he called Horsey and boasted, "I'm the man." He and Brian Smith together had shot and killed David Courts on Chase Street. After verifying the fact and location of that killing, Horsey paid Colkley $10,000, which he split with Brian Smith. In a surge of generosity, Colkley also decided to donate $500 to Boyd, who was in the hospital after having lost his eye.

This brings us to the effort of the Clayton Colkley—Eric Horsey—Brian Smith conspiracy to eliminate Edwin Boyd as a potential witness against them. Colkley was arrested on July 9, 2003. Colkley was keenly aware of the danger posed by Boyd. When interviewed at the Homicide Unit by Sergeant Massey, Colkley told Sergeant Massey that he, Colkley, had been present when the lawyer for Boyd, Jack Rubin, called Sergeant Massey and "it seemed like [the sergeant] was frustrated or upset" during the call. Colkley insisted that he

"wasn't worried about what Boyd told "the police" because Mr. Rubin had advised him that Boyd's statement would not be admissible.[5]

Shortly after Colkley's arrest, Horsey, along with Brian Smith, was in telephone contact with him. Horsey described the conversation:

> [M]e and Bee [Brian Smith] met up, when we met up, by the time we met up, he was already on the phone talking to Coco [Colkley] and he puts me on the phone. I'm speaking to Coco and *Coco [Colkley] at that point was telling me that the case ... the State had against him was weak.* The only thing, *the only place where they had any type of strength* that came from their case *was from* the kid, E–Money Bags *[Boyd]. He supposed to make a tape for the State. He told the State law enforcement about the whole incident and it was recorded.* So, *somehow, he got a whiff of the tape* and he was telling me that, you know, *they had to get rid of* E–Money Bags *[Boyd] because without* E–Money Bags *[Boyd], they won't have no case.*

(Emphasis supplied).

Horsey was of the opinion that Colkley gave him this information "because he actually wanted me to pay for them [Colkley and Brian Smith] to kill E–Money Bags [Boyd]." Horsey maintained that he told Brian Smith that he was not going to finance the killing of Boyd. "I wasn't paying for them to kill no kid." In any event, Boyd was killed one hour and fifty-nine minutes after Colkley was taken from the Homicide Unit to Central Booking.

On two earlier occasions, Colkley and Brian Smith had continued to carry out contract killing attempts for Horsey even when ostensibly "the deal [was] off." They were not paid for killing William Courts only because William Courts did not die. They were paid $10,000 for killing David Courts even though ostensibly "the deal was off." Several days after the

---

5. That reassurance, however, did not presume to cover Boyd's possible live testimony.

telephone conversation of Colkley, Smith, and Horsey, Brian Smith reported to Horsey about the killing of Boyd:

[PROSECUTOR]: When was it planned, do you know?

[HORSEY]: Within a few days, a week at the latest. Bee [Brian Smith] pulled up down on my block and I seen him. *He pulled up. He had an obituary in the window. He* said, *had just come from,* the guy E–Money Bag's *[Boyd's] funeral.* I said, you come from his funeral. He said, yeah. He said—

[COLKLEY'S COUNSEL]: Objection.

[PROSECUTOR]: It's a conspiracy Your Honor.

[THE COURT]: Overruled. You can answer, Mr. Horse[y].

. . .

[HORSEY]: Yeah, he said, *he just came from* E–Money Bags' *[Boyd's] funeral. He said,* you know *they had to get rid of him. Either him or they was going to send Coco [Colkley] up the river meaning Coco was going to get a life sentence. So he [opinioned] to kill the kid.*

. . .

[PROSECUTOR]: And *did* Bee *[Brian Smith] tell you how that murder transpired?*

[HORSEY]: *He told me that a female had [lured] E–Money Bags [Boyd] out of the house.*

(Emphasis supplied).

Horsey continued to get the details of Boyd's killing from Brian Smith. The only ultimate reason Horsey gave for not paying the "hit man" was that Horsey did not know the "hit man."

[COLKLEY'S COUNSEL]: So, did Bee [Brian Smith] explain to you how the, *did he explain to you about how the murder of* E–Money Bags *[Boyd] took place,* the juvenile?

[HORSEY]: He just, basically, *he told me that they had some female lure him out of the house and he showed me the guy who actually killed him, but the guy was from West Baltimore. I ain't know the guy.* He showed me.

[COLKLEY'S COUNSEL]: When you say he showed you, *what did he do?*

[HORSEY]: Actually, *me and him* was, went to, he *went to meet, I took him to go see the guy one day and he told me that's my man that* hit E–Money Bags *[Boyd] that killed* E–Money Bags *[Boyd], but I ain't know the guy. So I ain't paying nothing, think nothing of it.*

(Emphasis supplied).

In order for Boyd's taped statement to the police of June 13, 2003, to have been admissible, the State had to satisfy the evidentiary requirements of Courts and Judicial Proceedings Article, § 10–901(b), which provides:

(b) *Hearing.*—Subject to subsection (c) of this section, before admitting a statement under this section, the court shall hold a hearing outside the presence of the jury at which:

(1) *The Maryland Rules of Evidence are strictly applied;* and

(2) *The court finds by clear and convincing evidence that the party against whom the statement is offered* engaged in, directed, or *conspired to commit the wrongdoing that procured the unavailability of the declarant.*

(Emphasis supplied).

With respect to 10–901(b)(2), Judge Russell was persuaded, to the clear and convincing level of persuasion, that Colkley conspired with Horsey and Brian Smith "to commit the wrongdoing that procured the unavailability of the declarant," Boyd:

After having heard the testimony and assessing the credibility of the witnesses at this hearing, I have made the determination that as to Mr. Colkley, *the State has established by clear and convincing evidence that Mr. Colkley engaged in, directed or conspired to make, to commit*

*wrongdoing that was intended to and in fact did cause Mr. Boyd to be unavailable.*

(Emphasis supplied).

With respect to 10–901(b)(1), most of the testimony at the hearing by Horsey was with respect to events that Horsey participated in or witnessed first-hand. Most of Horsey's testimony posed no admissibility problems. Requiring deeper analysis, however, are several assertions about the killing of Boyd made to Horsey by Brian Smith. We hold that those assertions qualify as exceptions to the rule against hearsay as declarations made by a conspirator in furtherance of the conspiracy.

There was unquestionably a conspiracy among Colkley, Horsey, and Smith to carry out the contract killings of, at an initial minimum, William Courts and his brother David Courts. That conspiracy unquestionably included the direct purpose of the contract killings themselves but also the necessary cover-up of preventing detection by police and use by the prosecution, as particularly evidenced by Colkley's telephone conversation with Horsey on July 9, 2003, that "they had to get rid of Boyd because without Boyd, they won't have no case." Even though Horsey at one point seemed to balk at paying for the killing of Boyd, he was still considering whether to pay or not as Smith reported to him the details of the killing and actually took him to see "the guy from West Baltimore" who was Boyd's "hit man."

In any event, whether part of a two-man conspiracy with Colkley alone or as part of a three-man conspiracy with Colkley and Horsey, Brian Smith was the man on the outside charged with carrying out the elimination of Boyd, whose testimony was otherwise "going to send [Colkley] up the river." As Smith spoke with Horsey, moreover, the coverup was still very much operational.[6] The out-of-court assertions

---

**6.** The statements that Smith made to Horsey about Boyd's killing were also against Smith's penal interest. They could have been damaging to Smith's penal interest if Horsey ever turned State's witness, as Horsey

made by Smith to Horsey were unquestionably statements made by a conspirator in furtherance of the purposes of the conspiracy. We see no error in the ruling that Boyd's taped statement to the police was admissible.

## VI. The Quintessence of Inconsequentiality

The sixth contention is raised by Colkley alone and is truly "much ado about nothing." The contention pushes out the envelope of consequentiality to the breaking point. When Colkley was arrested on July 9, 2003, he was interrogated by Sergeant Massey. Colkley did not give an inculpatory statement. In the direct examination of Sergeant Massey, he was asked whether Colkley had said anything that "struck him as unusual." After a half a page in the transcript of objection and ruling and reobjection and reargument, Sergeant Massey expressed having found it "odd" that Colkley "wasn't familiar with anything that happened in the 1700 block of Port Street."

In view of other background information that freely came into evidence, it was, indeed, odd. Colkley was familiar with the fact that Boyd had given a taped statement to the police about what had happened in the 1700 block of Port Street. It was Colkley who had taken Boyd to the law offices of Jack Rubin, Esq. Colkley was present when Rubin called Sergeant Massey by telephone and told him that Boyd did not have anything to say about the shootings on May 28, 2003, and that Boyd did not wish to talk about it with Sergeant Massey any further. The sergeant testified about Colkley's knowledge of Boyd's taped statement and about Boyd's viewing of photographic arrays. It was Colkley who was reassured, moreover, by Jack Rubin that both the taped statement and the photographic identification would not be admissible in evidence. Sergeant Massey testified:

[COUNSEL]: What, if anything, did Mr. Colkley say about the taped statement?

---

ultimately did. The statements were also abundantly corroborated, as that particular exception requires.

[MASSEY]: Mr. *Colkley said* that he *was informed by his lawyer that Edwin's [Boyd's] taped statement would be thrown out* because I interviewed [Boyd] without his parents and that statement would be thrown out.

[COUNSEL]: And *what,* if anything, *did Mr. Colkley say would indicate that he was aware of there being photographic arrays.*

[MASSEY]: Also *he said that the photo arrays would be thrown out.*

[COUNSEL]: Now, had you, in fact, had a conversation on the phone with Mr. Jack Rub[in]?

[MASSEY]: Yes, I did.

(Emphasis supplied).

In view of Colkley's thorough understanding of the progress of the investigation, it was truly "odd" for him to say that he had no knowledge about "what happened in the 1700 block of Port Street." Odd or not, however, it is simply too trivial a trial hiccup to warrant further comment.

Colkley is also offended by one other snippet from Sergeant Massey's examination. Apparently, the communicative rapport between Colkley and the sergeant was not a happy one. Colkley, who had been present at the other end of the telephone conversation between Jack Rubin and Sergeant Massey, apparently was initially zeroing in on the sergeant and the sergeant then got in one zinger in return.

[COUNSEL]: *Now, had you ever met Mr. Colkley before that morning?*

[MASSEY]: *No, sir.*

[COUNSEL]: *[W]hat did he say to you regarding your anger issues or whether you had anger issues?*

[MASSEY]: *Yes. He said it sounded like I was angry when I was on the phone talking to Mr. Jack Rub[in].*

[COUNSEL]: *What was his demeanor when he expressed that to you?*

[MASSEY]: *Somewhat arrogant and cocky.*

(Emphasis supplied).

All that emerges from this is the unremarkable fact that Colkley and Sergeant Massey did not like each other very much. One apparently got angry when his investigation was checkmated and the other was being "arrogant and cocky" when he taunted him about it. The whole contention, moreover, revolves around an immaterial sideshow. Colkley's citation to *Bohnert v. State*, 312 Md. 266, 278, 539 A.2d 657 (1988) is completely unavailing. *Bohnert* concerns improper comment on the credibility of a witness. Colkley was never a witness. He did not take the stand in his own defense. *Bohnert*, therefore, has nothing to do with this case.

## VII. Another Voice From The Grave

Life expectancy takes a decided downturn among drug dealers and hit men. A goodly number live to attend the initial trial. To make it to a retrial, however, is almost beyond reasonable expectation. Edwin Boyd, a member of the May 28, 2003 execution squad led by Colkley, did not see his 18th birthday, let alone the first trial. Qonta "Little Boy" Waddell was also an early casualty. He testified at the first trial but did not make it to the retrial. We are told only that he had "passed away."

His spirit, however, was very much in evidence at the retrial, delivering not one but two counterbalancing versions of the events of May 28, 2003, one for the State and the other for the defense. Waddell was part of the target group who sold drugs in the neighborhood of Lafayette Avenue and Port Street, but he was not wounded in the attack of May 28. He, along with his confederates, Jermaine "Polish" Lee and Broderick "Billy" Campbell, were, however, arrested on Port Street on July 2, 2003 and charged with a variety of drug and firearm-related offenses. While in custody, Waddell contacted Sergeant Massey and offered information about the May 28 shooting.

In that taped statement, relied on at the retrial by the State, Waddell said that he was standing "at the top of" Port Street on May 28 when a Grand Marquis drove down the street and stopped. James "Buck" Bowens, also a member of the target group, was standing on the passenger side of the car and was reassured that all was well when he recognized the driver of the Grand Marquis as the appellant Darnell "Pooh" Fields, from whom he had purchased marijuana in the past. As Bowens casually remarked, "That's Pooh," four men with guns got out of the car and opened fire on the target group. Bowens himself was the first victim and a fatal one. From photographic arrays, Waddell identified the appellant Colkley, the appellant Fields, and Edwin Boyd as three of the gunmen. Waddell stated that he himself hid behind a van until the shooting was over. At the retrial, as well as at the first trial, that taped statement of Waddell's was played before the jury.

At the first trial, however, Waddell subsequently took the stand and gave a version of May 28, 2003 that was the 180 degree opposite of his earlier recital in the taped statement to the police. He may also have been honoring the code of the street. Dr. Jekyll had become Mr. Hyde or vice-versa. He testified that at the time of the shootings, he was romantically engaged with a woman named Tiffany Smith at the Holiday Inn on Moravia Avenue. He was not even present on Port Street. He further testified that he did not know either Colkley or Fields and, therefore, could not identify either man. He further explained that he was high on cocaine when he allegedly gave the statement to Sergeant Massey and that he could not remember ever having given such a statement. He further explained that he wanted to get out of jail after his arrest and would, therefore, have had good reason to tell the police whatever he thought they wanted to hear. Waddell's transcribed testimony from the first trial was also read to the jury at the retrial to impeach the credibility of the statement given to the police.

At the retrial now under review, the State, naturally enough, was pushing for the jury to accept the A version of

events rather than the B version from the then dead declarant, Waddell. To shore up the A version, Sergeant Massey testified that when Waddell gave his taped statement on July 2, 2003, he did not appear to be under the influence of cocaine. Colkley now contends that that characterization of Waddell's condition by Sergeant Massey constituted improper lay opinion testimony.

This contention is squarely controlled by Maryland Rule 5–701, which provides:

> If the witness is not testifying as an expert, *the witness's testimony in the form of opinions* or inferences *is limited to those opinions* or inferences which are (1) *rationally based on the perception of the witness and* (2) *helpful to a clear understanding of the witness's testimony* or the determination of a fact in issue.

(Emphasis supplied).

In reviewing the testimony of Sergeant Massey in this regard, it is clear that his opinion of Waddell's condition was "rationally based on [his] perception of [Waddell]." He observed at close hand how Waddell looked and spoke and responded to questions. It is also clear that the sergeant's observations of Waddell at the time of the taped statement would, to the jury, have been "helpful to a clear understanding of" the declarant's statement. We see no abuse of discretion in Judge Russell's ruling that Sergeant Massey's observations and opinion were admissible.

## VIII. Alleged Discovery Violation

The eighth contention is also raised by Colkley alone. Colkley claims that the State was guilty of a discovery violation and that Judge Russell erroneously ruled, in a pretrial ruling on January 29, 2010, that the State had not been guilty of such a discovery violation. The whole discovery issue revolves around Eric Horsey, who testified as a State's witness. Although Colkley paints with a broad brush, alluding to, in passing, half a dozen various subsections of Maryland Rule 4–263, what is actually argued narrows down to a claimed

violation of 4–263(7)(B). That subsection requires the State to disclose to a defendant, without the necessity of a request, "[a]ll relevant material or information regarding pretrial identification of the defendant by a State's witness."

Horsey, of course, was the narcotics kingpin who had hired Colkley as a hit man to eliminate William Courts and his brother, David Courts. He had paid Colkley $10,000 for successfully getting rid of David Courts. The two men were thoroughly acquainted with each other. The whole issue of whether Horsey could identify Colkley, therefore, was of no significance.

The pivotal factor in the Horsey story is that he was arrested by federal authorities on drug conspiracy charges in 2006. In exchange for a federal sentence of 10 years to life and immunity for any other crimes he may have committed, Horsey agreed to supply information to federal and state authorities and to testify against others involved in various criminal activities. The State disclosed to Colkley that Horsey had identified him in a single photographic array. When Horsey testified at the pre-trial hearing concerning the killing of Edwin Boyd, however, he acknowledged on cross-examination that he might have viewed photographic arrays involving Colkley on two or three occasions in the course of the federal investigation. The possible discrepancy between viewing one photographic array and viewing two or three photographic arrays is the sole predicate for this contention.

At the hearing on the arguable discovery violation, the State explained that it had never received either from Horsey directly or from the federal prosecutors any taped or written statements by Horsey and that it had been made aware of only a single pretrial identification of Colkley by Horsey, which information it properly revealed to Colkley's defense team. The discovery obligation on the State's Attorney's Office as made clear by Rule 4–263(c)(2), which provides:

*Scope of obligations. The obligations* of the State's Attorney and the defense *extend to material and information* that must be disclosed under this Rule and *that are in the*

*possession or control of the attorney, members of the attorney's staff, or to any other person who either reports regularly to the attorney's office or has reported to the attorney's office in regard to the particular case.*

(Emphasis supplied).

That obligation does not impose on the local prosecutor the duty to know about or to reveal information in the hands of federal agents who are not working closely with the State. In that regard, Judge Raker wrote for the Court of Appeals in *Thomas v. State,* 397 Md. 557, 569, 919 A.2d 49 (2007):

Ordinarily, *the obligation* to not only provide discovery, but to impute information within the knowledge of a State agent to the State's Attorney, *does not apply to federal agents because they do not usually participate in the investigation or evaluation of the action and do not either regularly report, or with reference to the particular action, actually report to the office of the State's Attorney.*

(Emphasis supplied).

Judge Russell ruled that there was no discovery violation. We see no error in that ruling. It is a case of carrying coals to Newcastle to observe that even if, purely *arguendo,* there had been a discovery violation, there would have been no possible prejudice to the defense. Unawareness that Horsey had identified Colkley in a pre-trial photographic array two or three times instead of once would have been absolutely meaningless to the defense of this case. It is inconceivable how that could have been of any value whatsoever.

## IX. The Resentencing of Colkley

■ Colkley challenges the legality of the sentences he received at his resentencing on September 14, 2011 for three reasons, at least two of which have merit. He initially contends that his 25–year sentence for a first-degree assault on William Courts and his concurrent 10–year sentence for second-degree assault on Courts were illegal. Commendably, the State agrees, conceding that the two sentences must be vacated. In this case, the jury foreperson's oral announcement of

the verdict did not include mention of either first-degree or second-degree assault and those offenses were not included in the hearkening of the verdicts. The docket entry, moreover, confirms that a verdict was "not rendered" with respect to either charge. The verdict sheet, to be sure, indicated that Colkley had been convicted of both degrees of assault. As Judge Kenney pointed out for this Court in *Ogundipe v. State,* 191 Md.App. 370, 381, 991 A.2d 200 (2010):

> [T]he verdict sheet itself is a tool for the jury to utilize in deciding its verdict but it does not constitute the verdict.

*See also State v. Santiago,* 412 Md. 28, 40, 985 A.2d 556 (2009); *Jones v. State,* 384 Md. 669, 866 A.2d 151 (2005); *Heinze v. State,* 184 Md. 613, 616, 42 A.2d 128 (1945).

There were, therefore, no legal verdicts of guilty for either degree of assault and sentences should not have been imposed for those crimes. *Jones v. State,* 384 Md. at 686, 866 A.2d 151 ("[B]ecause the jury was not polled and hearkened to that Count in absence of its oral announcement, the verdict of guilt cannot stand and any sentence apportioned thereto must be vacated."). On remand, those two sentences need to be vacated.

At the resentencing, moreover, Colkley was sentenced to a consecutive term of 20 years for the use of a handgun, a consecutive sentence of 10 years for one count of wearing, carrying, or transporting a handgun, and another concurrent sentence for the remaining count of wearing, carrying or transporting a handgun. We agree with Colkley that he should not have suffered two convictions for wearing, carrying or transporting a handgun. The unit of prosecution for that offense is the handgun itself and not the uses that are made of it. *Webb v. State,* 311 Md. 610, 617–18, 536 A.2d 1161 (1988). We further agree with Colkley that the one legitimate conviction for wearing, carrying or transporting a handgun must then be merged into the conviction for the use of a handgun. *See Wilkins v. State,* 343 Md. 444, 445–47, 682 A.2d 247 (1996); *Hunt v. State,* 312 Md. 494, 510, 540 A.2d 1125 (1988); *Carpenter v. State,* 196 Md.App. 212, 232–33, 9 A.3d 99

(2010); *Tilghman v. State,* 117 Md.App. 542, 571–72, 701 A.2d 847 (1997); *cert. denied,* 349 Md. 104, 707 A.2d 90 (1998). The State also agrees with this conclusion. On remand, one of the convictions for wearing, carrying or transporting a handgun must be reversed and the other must be merged into the conviction for the use of a handgun.

Colkley's third challenge to his resentencing is now moot. His complaint was that the original aggregate sentence at his first trial was one of life plus 50 years and that the aggregate at the resentencing was life plus 55 years, an impermissible increase of five years. With the elimination of the consecutive 25–year sentence for a first-degree assault on William Courts, however, the aggregate sentence at the end of the second trial is now reduced to one of life imprisonment plus 20 years and no further discussion of the propriety of an increased sentence is necessary.

## X. The Resentencing of Fields

We also agree with the appellant Fields that there was a flaw in his resentencing. At his first trial, he was sentenced to a term of life imprisonment with all but 45 years suspended for his conviction of conspiracy to murder William Courts. At his retrial, he was sentenced on that same conviction to a term of life imprisonment with no part of the sentence suspended. That, of course, constitutes an increase in the sentence. Maryland Code, Courts and Judicial Proceedings Article, § 12–702(b) provides:

> (b) *Remand for sentence or new trial; limitations on increases in sentences.—If an appellate court remands a criminal case to a lower court in order that the lower court may* pronounce the proper judgment or sentence, or *conduct a new trial, and if there is a conviction following this new trial, the lower court* may impose any sentence authorized by law to be imposed as punishment for the offense. However, it *may not impose a sentence more severe than the sentence previously imposed for the offense unless:*
>> (1) *The reasons for the increased sentence affirmatively appear;*

(2) The *reasons are based upon additional objective information* concerning identifiable conduct on the part of the defendant; *and*

(3) *The factual data upon which the increased sentence is based appears as part of the record.*

(Emphasis supplied). *See Jones v. State,* 307 Md. 449, 454, 514 A.2d 1219 (1986) (explaining that § 12–702(b) codified the constitutional doctrine articulated by the Supreme Court in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) and adopting "significant portions of the *Pearce* language."); *Davis v. State,* 312 Md. 172, 181–83, 539 A.2d 218 (1988). Once again commendably, the State agrees that the sentence must be vacated.

On remand, the State might seek to justify the increase by attempting to satisfy § 12–702(b). On the other hand, a sentencing rehearing would not be necessary on remand if the original sentence of life imprisonment with all but 45 years suspended were simply reimposed.

**WITH RESPECT TO APPELLANT COLKLEY, SENTENCES FOR FIRST–DEGREE ASSAULT AND SECOND DEGREE ASSAULT VACATED; CONVICTION FOR ONE COUNT OF WEARING, CARRYING AND TRANSPORTING A HANDGUN REVERSED AND SENTENCE VACATED; CONVICTION FOR REMAINING COUNT OF WEARING, CARRYING AND TRANSPORTING A HANDGUN MERGED INTO CONVICTION FOR USING A HANDGUN; JUDGMENTS IN ALL OTHER RESPECTS AFFIRMED; WITH RESPECT TO APPELLANT FIELDS, SENTENCE FOR CONSPIRACY TO MURDER VACATED AND REMANDED FOR RESENTENCING CONSISTENT WITH THIS OPINION; JUDGMENTS IN ALL OTHER RESPECTS AFFIRMED. COSTS TO BE PAID ONE–HALF BY MAYOR AND CITY COUNCIL OF BALTIMORE; ONE–FOURTH BY APPELLANT COLKLEY, AND ONE–FOURTH BY APPELLANT FIELDS.**